JOHN RANDEL, JUN., APPELLANT *v.* WILLIAM LINN BROWN.

WILLIAM LINN BROWN, APPELLANT, *v.* JOHN RANDEL, JUN.

John Randel, Jun., placed in the hands of Brown two certificates of stock, which Brown afterwards refused to restore.

Randel filed a bill in chancery against Brown, alleging that the deposit had been made for an especial purpose, which had failed.   The answer denied this, and claimed a lien on the certificates, or that they were given as a payment.

*Held,* from the bill, answer, and evidence, that they were not delivered to Brown, either as a payment of a debt to himself, or to secure him from responsibility to another.

*Held* also, that Brown had no legal or equitable interest in them at the time of the rendition of the decree.

The rights of the parties as they stand when the decree is rendered, are to govern, and not as they stood at any preceding time.

The retention of property, after the extinguishment of a lien, becomes a fraudulent possession.

" A lien cannot arise, where, from the nature of the contract between the parties, it would be inconsistent with the express terms or the clear intent of the contract."

THESE two cases were argued together, being cross appeals from the Circuit Court of the United States for the eastern district of Pennsylvania, sitting as a court of equity.

The facts admitted or proved were few.

Prior to, and during the year 1831, Randel was engaged in a re-

markably troublesome litigation with the Chesapeake and Delaware Canal Company. In that year Brown was a student of law in the office of John Sergeant, Esq., of Philadelphia, who was one of Randel's counsel. Through his visits to the office, Randel became acquainted with Brown, who was then twenty-five years of age.

In the latter part of 1831, Randel removed to the state of New York, and engaged the services of John M. Clayton, Esq., of Delaware, who became the principal counsel in the cause.

During the years 1832 and 1833, the suit was prosecuted in Delaware against the canal company, Brown absenting himself from the office of Mr. Sergeant, at first partially, and then almost wholly. The troublesome nature of the controversy may be inferred from the facts, that the counsel for the canal company filed sixty-two pleas, to each of which there was a replication or answer. The whole of these were afterwards withdrawn : the record broken up : new counts added to the declaration : twenty-nine new pleas and demurrers filed, to each of which there was a replication or a joinder in demurrer, as the case might require, all of which were drawn out at full length. In the preparation of these papers Brown rendered such aid as he was able to do. The demurrers were argued at May term and November term, 1833, and over-ruled. On the 9th of December, 1833, the cause came on to be tried, and on the 25th of January, 1834, the jury found a verdict in favour of Randel for $226,885.

On the 18th of September, 1834, the sum of $2000, with the interest due, and to become due thereon, was entered upon the record, as being assigned for the use of Brown.

On the 22d of September, 1834, Brown caused attachments to be issued against the captains of vessels passing through the canal as garnishees of the tolls.

On the 26th of September, 1834, Brown accepted an order drawn by Randel in favour of William M. Camac for $2000, payable out of the first moneys he might obtain from said company on said account, or from tolls attached. If more than one year should elapse before the whole of the $2000 was obtained, then he was to pay to Camac an interest of 6 per cent on whatever balance might remain unpaid after the expiration of one year.

During the years 1834, 1835, and 1836, the attachments became the subject of much litigation, but were ultimately confirmed.

In March, 1836, an arrangement was made between Randel and the canal company, by which the latter issued certificates of stock,

the interest upon which and principal were to be paid in preference to all other debts, the tolls being pledged for that purpose. This arrangement, however, was not consummated until April, nor were the certificates issued until July. They were then issued in manuscript for $5000 each. In October they were issued in a printed form.

On the 18th of April, 1836, Randel gave Brown his promissory note at ninety days for $300, which was not paid.

On the 22d of October, 1836, Randel gave Brown a power of attorney, authorizing him to sell, assign, and transfer unto himself or to any other person or persons, $10,000 of the funded debt of the Chesapeake and Delaware Canal Company, entitled to priority of payment and transferable according to certificates thereof, numbered 34 and 35, each for $5000.

On the same day Brown re-assigned to Randel the $2000 worth of the judgment which had been assigned to Brown on the 18th of September, 1834.

Under the power of attorney, Brown transferred $10,000 to himself, and took out new certificates in his own name.

On the 29th of October, 1836, Randel filed his bill in the Circuit Court for the eastern district of Pennsylvania, in which he alleged that he was desirous of negotiating a loan from one of the banks in the city of Philadelphia, and hoped to do so by depositing as collateral security such of the certificates of debt, issued by the canal company, as might be sufficient to protect the lender from loss, giving at the same time his promissory note in the customary form ; that he stated this desire to Brown, who replied that he had transacted business with the Schuylkill Bank, of which his cousin, Frederic Brown, was a director, and that he would do what he could for him ; that Brown soon afterwards informed him that he feared he could not succeed ; that the complainant then informed Brown that he would give $500 for a loan for a twelve-month ; that the complainant and Brown agreed that, as a premium was offered, it would be better that the name of the complainant should not appear in the transaction ; that Brown then said he would negotiate it in his own name upon the hypothecation of the certificates, to which the complainant agreed ; that the complainant afterwards understood from Brown that he had drawn a note for $10,000, payable in twelve months, and placed at the foot of it a memorandum, showing that it was to be secured by certificates of the debt of the Chesapeake and Delaware Canal Com-

pany; that the complainant then observed that it would be well to add that a power of attorney would be given to sell or transfer the certificates which would enable the bank, at once, to draw the interest to meet the note.

The bill further stated that Brown came to the house of the complainant in Wilmington on the 22d of October, and stated that he had prepared a new note, according to the form above stated, which had been presented to the bank and thrown out; but that it would be presented again, and it would be proper for him to have the certificates and a power of attorney authorizing a transfer, in order to give it its best chance; that the complainant assented and gave Brown two certificates of the character above described, of $5000 each, and the power of attorney; that the complainant handed to Brown a blank form of a power of attorney similar to the one which had been filled, requesting him to fill it up as a copy, and write upon it a receipt for the power and certificates, stating in such receipt an engagement to return the certificates on the punctual payment of the note and interest, and also an engagement to account to the complainant for the dividends which he might have received whilst the certificates were in his possession; that Brown promised to make out a fair copy of such receipt and give it to the complainant, which, however, he wholly omitted to do.

The bill further stated that at the next interview between them, Brown said that the bank would not lend the money, and upon the complainants requesting that the certificates might be restored to him, Brown refused, and said, "I mean to hold the certificates and power of attorney until you settle with me; I have now got you in my power;" that the complainant denied owing him any thing, but that he had always intended to make him, Brown, a handsome present.

The bill further stated that the complainant went immediately to the office of the canal company for the purpose of stopping the transfer, but found that Brown had effected it on Monday, the 24th of October, (the power having been given to him on Saturday, the 22d,) and had, on Tuesday morning, received fresh certificates in his own name.

The bill then charged that these proceedings of Brown were fraudulent proceedings, and a direct breach of trust; that the deposit of the certificates was made in the hands of Brown merely as a trustee, in the full trust and reliance that no use whatever would be made of it but for the purpose of procuring a loan from the Schuylkill Bank.

It then called upon Brown to answer whether he did not receive the certificates and power of attorney in trust and confidence, in the manner and under the circumstances aforesaid, and to answer the several charges in the bill, concluding with a prayer that Brown might be ordered to restore the certificates, and in the mean time an injunction might issue.

In March, 1837, Brown filed his answer, in which he set forth that as early as the spring of 1831, at the instance and request of the complainant, he engaged in the service of the said complainant, and particularly in the suit with the canal company; that he had various duties to perform, and assisted in the preparation of papers of great extent and importance; that he attended diligently to these services; that his whole time from 1831 to 1836 was entirely at the command of the complainant; that soon after the engagement the complainant informed him that he would pay the respondent a reasonable compensation for time actually bestowed in his service in any event; that he would bear his travelling and other expenses; and that in the event of success he, the complainant, would pay to the respondent two and a half per cent. on the sum received in the said suit with the canal company.

The answer further set forth that the assignment of $2000 of the judgment was made to the respondent in payment, up to that period, of the time expended by the respondent in the service of the complainant.

The answer further set forth that the complainant desired him to accept an order in favour of Camac for $2000, promising to place funds in the hands of the respondent to pay and take up the said order, which order the respondent accepted.

The answer further stated that in April, 1836, the complainant gave to the respondent his promissory note for $300 as a payment for the time expended since the the assignment of the judgment, which note was never paid by the complainant.

The answer further set forth that on the 20th of October, 1836, after a conversation between the parties respecting a settlement between themselves, the complainant took from his pocket two certificates of the funded debt, each for $5000, and handed them to the respondent, and upon the respondent asking what they were for, the complainant replied " they are to pay you and Mr. Camac," adding that he wished the respondent to go to New Castle and reassign the judgment for $2000. In consequence of this, the respondent did go to New Castle and reassign the judgment, on which same day the

complainant executed to the respondent the power of attorney spoken of in the bill.

The answer then averred, that the transfer of stock had been made by the respondent to himself, and that the certificates had been given to him, not in trust, but absolutely as a payment to himself for a debt due and ascertained from the said complainant, and to place him in funds for the payment of the order in favour of Camac. An account was also alleged against the complainant, the particulars of which were stated.

The answer admitted that the respondent had applied to his cousin, Frederick Brown, to procure a loan of money for the complainant, amounting to $10,000; that he drew his note for that sum, stating at the foot of it that the same amount of the funded debt of the canal company would be offered as collateral security; but denied that Frederick Brown was to receive $500, or that the note was offered at the Schuylkill Bank, or any other bank. It denied also that the matter of the loan had any connection with the two certificates handed to the respondent by the complainant. On the contrary, it averred that the loan was to be secured by other certificates.

The answer further averred, that no allusion was made directly or indirectly, by the complainant, to the certificates or power of attorney, until a conversation in which the respondent declined to act as agent for the complainant in the purchase of a piece of ground, unless the complainant would pay all his debts; and that the complainant then, for the first time, with great asperity, asked why the respondent had not given him a receipt for the certificates. The conversation proceeded with much warmth, and terminated with a demand from the complainant for a restoration of the certificates and a refusal to surrender them on the part of the respondent. The answer then replied particularly to the interrogatories of the complainant, and concluded by saying that the certificates were surrendered to the court upon the presentation of the complainant's bill.

Under commissions to take testimony, a vast mass of evidence was collected, consisting chiefly of the declarations of the parties respectively as to the compensation which Brown was to receive for his services, and the value of those services.

In May, 1839, the case was referred to John M. Scott, Thomas I. Wharton, and Peter McCall, Esquires, who were authorized to act as masters therein, with power to take depositions, &c., and directed to report the evidence to the court, together with a statement by the

said masters, or a majority of them, of such facts as in their opinion were established by the evidence, together with their opinion touching any matters on questions which they may deem material for consideration; and especially, first, to report the terms, consideration, and conditions of the transfer of the two certificates of debt referred to in the bill and answer, in the consideration of which, the answer of the defendant, so far as it is responsive to the averments of the bill or interrogatories, or a denial of the former, is to be taken as evidence of the cause, according to the rules of equity. Second, to report what sums of money have been paid by the plaintiff to defendant, for or on account of disbursements made by defendant—time, labour expended, services rendered, for or to the plaintiff, for his use or at his request; whether any sum is yet due to defendant therefor, and to what amount.

Two of the masters united in a report; the third filed a separate one.

The two masters, in their report, recapitulated the principal part of the evidence which led them to their conclusion, and found—

1. That the delivery of the certificates by the complainant to the respondent was not absolute, but upon a trust.

2. That the trust was to raise money.

3. That of the money so to be raised, part was to be paid to Mr. Camac; and that, as to this part, the respondent had a direct interest in the execution of the trust, in consequence of his acceptance of the draft in favour of Mr. Camac, referred to in the answer, and of his re-transfer of the interest in the judgment upon which the draft was drawn.

4. That another portion of the money so to be raised, was to be paid to Mr. C. Ingersoll.

5. That no express appropriation of the balance, or any part thereof, was made at the time by the complainant in favour of the respondent.

6. But that an intention had been declared previously, by the complainant, to pay or present to the respondent, through the medium of such certificates, a sum of money, the amount of which was not stated or specified, as a compensation or remuneration for his services during the pendency of the suit with the Chesapeake and Delaware Canal Company; but we do not find that any express reference to such declared intention was made at the time of the transaction.

7. That, in point of fact, no money was raised upon the certificates.

8. That, on Monday, the twenty-fourth of October, 1836, the certificates were transferred by the respondent (under the power of attorney) to himself, and so remain; and

9. That, since the filing of the bill in this case, the complainant has parted with all the remaining certificates of debt due to him by the said Chesapeake and Delaware Canal Company.

The two masters further reported, that the weight of testimony was against the allegation that the transfer of the $2000 was in payment for time expended.

They further reported that such a promise was made by the complainant, as the respondent has set forth; but that nothing was due to the respondent for his time expended.

They further reported that for labour and services rendered by the respondent to the complainant, for his use and at his request, there was due a sum equal to two and one-half per cent. on the amount of the judgment recovered against the canal company, viz. the sum of $5659 64. And that the debt due to Mr. Camac had been paid by Randel since the cause commenced.

On the subject of payments, the two masters reported that there was a balance of $10, which was to be applied to Mr. Randel's credit on the general account.

The third master concurred with the other two as to the contract for two and one-half per cent., and that the transfer of the certificates was in trust; but was of opinion that Brown's own claim was to be paid out of the proceeds, and that the $2000 contract was not disproved by evidence sufficiently strong to deprive the answer of the weight given to it by the rules of equity.

Numerous exceptions to this report were filed by both the complainant and respondent—on the part of the complainant it was objected, that the report was erroneous, because

1. The part of the answer which stated the contract for two and one half per cent. was not responsive to the bill.

2. The respondent furnished no account of disbursements made or services rendered.

3. The payments alleged to have been made were not proved.

4. The sum of $80 was a payment and not a loan.

5. That nothing was due to the respondent from the complainant.

On the part of the respondent it was objected,

1. That the sums charged to the respondent in the account were not sustained by the evidence.

2. That the masters had not allowed the respondent sufficient credits.

In October, 1841, the cause came on to be heard upon bill, answer, replication, master's report, exhibits, depositions, and exceptions to report, and the court decreed that the exceptions to the master's report be disallowed; that there was due by the complainant to the respondent the sum of $5649 64, with interest thereon from the fifth day of May, 1840, making together the sum of $6136, which said sum should be paid and satisfied by and out of certain certificates of debt or the proceeds thereof, given to the complainant by the Chesapeake and Delaware Canal Company, and then under the control of the court. And, it was further ordered that the costs of the suit, including the fees of the masters, be divided between, and equally paid by, the complainant and respondent.

From this decree, both parties appealed to this court.

*J. R. Ingersoll* and *C. Ingersoll*, jun., for Randel.
*J. R. Tyson* and *Cadwallader*, for Brown.

The argument consisted chiefly, upon both sides, in an examination and comparison of the evidence; and it is therefore thought advisable to omit it. Some legal positions were taken and authorities adduced to support them, which will be mentioned.

### *J. R. Ingersoll.*

Where an answer is discredited in one particular, it is weakened in the remainder. 5 Monroe, 23.

A claim existing will not justify the retention of trust-funds, 9 Wheat. Palmer *v.* Gracie; Thompson *v.* Eyre, Supreme Court of Pennsylvania, 3 De Saussure's Chan. Rep. 268; 11 Wheat. 125.

The answer, setting up a contract, is not responsive to any part of the bill, and a defendant is only a witness as to what he is asked. 2 Stew. 302; 2 Johns. Chan. Ca. 88, 90; 1 Bibb, 195; 8 Cowen, 387; 1 Wash. (Va.) 224; 1 Mumf. 395.

### *J. R. Tyson.*

The confessions of a party form the weakest of all evidence deemed admissible in law. Bernard *v.* Flournoy, 4 J. J. Marsh. 101; Harding *v.* Brooks, 5 Pick. 244; Snelling *v.* Utterbach, 1 Bibb, 609; Linch *v.* Linch, 10 Ves. 517, 518; Thomas *v.* Thomas, 2 J. J. Marsh. 65; Morris *v.* Morris, 2 Bibb, 311; Logan *v.* McChord's heirs,

2 A. K. Marsh. 225; 2 Johns. Chan. Rep. 412; Robertson v. Robertson, 9 Watts's Rep. 43.

A power of attorney, if coupled with an interest in the thing, is irrevocable. Hunt v. Rosemaniere, 8 Wheat. 175, also 1 Peters, 1.

The assignment of the judgment and the power of attorney here are under seal. Every deed imports consideration. Plowd. 308; Burr. Rep. 1637.

In a case of *fraud*, if parties be *in pari delicto*, a court of equity may interpose for a complainant upon terms, or, owing to his demerit, may abstain from the slightest interference. 1 Fonbl. Eq. b. 1, sect. 3, note (h), and cases cited; 2 Story's Eq. Juris. 6, 7, and cases cited.

Parties to a bill are held to as strict account in proof of the case stated as parties to an answer, for the court pronounces its decree *secundum allegata et probata*. Boone v. Chilles, 10 Peters, 209, also 4 Mod. Rep. 21, 29; 3 Wheat. 527; 6 Wheat. 468; 2 Wheat. 380; 2 Peters, 612; 11 Wheat. 103; 7 Peters, 274; 2 Ves. 243; 1 Marsh. 325; 3 Bibb, 530.

He who asks the aid of a court of equity must offer to do equity. St. John v. Halford, Bart. 1 Chan. Ca. part 97; Lord Dacres v. Crompe, 2 Chan. Ca. part 87; Stanley v. Gadsby, 10 Peters, 521; Brown v. Swann, 10 Peters, 497; see 501.

*Cadwallader* cited the following authorities in addition to those cited by Mr. *Tyson*, respecting the declarations of parties. 7 Modern, 49; Foster, 243; Hardin, 549; 4 Serg. and Rawle, 331, 332; 14 Howell's State Trials, case of Duke of Richmond.

Because a man does what is wrong, a court should not take away what belongs to him and give it to another, to whom it does not belong.

A party may justify on a good ground, although there is also a bad ground in the case. 12 Modern, 387; Comyn, 78; Fitzherbert, Avowry, 232; 3 Coke, 26 a; 2 Leonard, 196; 7 T. R. 654, 658; 4 Bingham's New Cases, 638; 2 Dowl. and Ryl. 755, 756; 1 Eq. Ca. Abr. 354; 2 Chan. Ca. 23; 1 Vernon, 49, 51; 2 Vernon, 159; 14 Journal House of Lords, 601, reversing case in 2 Vernon; 2 Ball and Biggar, 271; 11 Wheat. 125, 126; 12 Peters, 297; 1 Chan. Ca. 97; 2 Chan. Ca. 87; 1 Peters, 382, 383.

*C. Ingersoll*, jun., in addition to arguing upon the evidence, com-

mented upon many of the above authorities, to show that they were not applicable to the case.

Mr. Justice McKINLEY delivered the opinion of the court.

Randel filed his bill against Brown, on the chancery side of the Circuit Court of the United States for the eastern district of Pennsylvania. In which he states that, wishing to negotiate a loan of $10,000, to be secured on certificates of the funded debt of the Chesapeake and Delaware Canal Company, he applied to Brown to aid him in the negotiation, with one of the banks in Philadelphia. And that it was agreed between them, that Randel should deliver to Brown two certificates of the funded debt of the canal company, for $5000 each, and execute to him a power of attorney, authorizing him to transfer the certificates to himself, or to any other person ; and that Brown should, upon his own note, and the pledge of the certificates, if practicable, obtain a loan, for Randel.

And in pursuance of this agreement, he executed the power and delivered it and the certificates to Brown. That instead of obtaining a loan of money, as he had promised, Brown transferred the certificates to himself, and delivered them up to the canal company, and obtained new ones in his own name. That when Randel applied to Brown to know whether he had obtained the loan of $10,000 for him, Brown replied, that he had bad news for him—"I have not succeeded at the bank;" that the bank had a disposition to lend, but had not the means. That Randel then requested him to return the certificates of debt, which Brown refused to do ; saying, he intended "to hold on to them" till Randel settled with him, or made him the present he had promised him.

Randel then put the following interrogatories to Brown: "Whether he did not receive the certificates and power of attorney in trust and confidence, in the manner and under the circumstances aforesaid ; and whether he had any interest in the same, and was not, in holding the same, a mere trustee for the complainant, and did not refuse to deliver them to him ; and whether he did not transfer said certificates to himself, on Monday, the 24th of October ; and what circumstances occurred before the board of directors, or were communicated to him ; and whether he did not inform the complainant, that he had not succeeded at the bank, and give the complainant to believe, that he had made application on that, or the preceding day ; and whether the certificates were not transferred, by said Brown, to his own use,

and not for the use of the complainant; and what use or disposition, if any, he had made thereof, and to whom, and for what consideration."

The answer denies all the material allegations of the bill, except it admits the receipt of the power of attorney and the certificates of debt. Brown then sets up, in his answer, a claim for services rendered to Randel, from the early part of the year 1831, till the 24th day of October, 1836, of various kinds, but particularly, in attending to, and preparing for trial, a suit brought by Randel against the said canal company. And he alleges that Randel agreed to give him a reasonable compensation, for time to be expended in his service, in any event, and to pay his travelling and other expenses; and in the event of success in the suit, the additional compensation of two and a half per cent. on the amount that might be received thereon; and that Randall finally recovered judgment, and received from the company, the sum of $230,000, in payment thereof.

But before the payment, and while it was uncertain whether any thing would be realized from the judgment, Brown states that, from exposure, in the service of Randel, he was taken sick, and it being uncertain whether he would recover or not, he applied to Randel for payment for the time then expended in his service, whereupon Randel caused to be transferred to the use of Brown $2000, part of said judgment. And a short time thereafter, about the month of September, 1834, Randel requested him to accept an order, drawn on him by Randel, in favour of a certain William H. Camac, for $2000, promising, at the same time, to place funds in his hands to meet its payment; which induced him to accept it. Brown refers to the order, in his answer, and which is as follows:

" Sir—Out of the sum of $2000 with interest due, and to become due thereon, which was assigned, at my request, by Samuel H. Hodson, to you, being one-fifth part of the sum assigned by me to him, on trust, the 27th of January last, out of the judgment obtained by me against the Chesapeake and Delaware Canal Company, please to pay to William H. Camac or order the sum of $2000, out of the first moneys you obtain from said company on said account, or on account of tolls attached. If more than one year elapse before you obtain the whole of said sum of $2000, then pay to said Camac an interest of six per cent. on whatever balance may remain unpaid, after the expiration of said term of one year." Brown accepted this order on the 26th of September, 1834.

It is further charged in the answer, that on the 18th day of April, 1836, for time expended in his service, from the date of the assignment of the said sum of $2000, down to that time, Randel gave to Brown a promissory note for $300, payable ninety days after date. He then charges, that the two certificates of debt were delivered to him by Randel, on the 20th of October, 1836, for the purpose of paying himself, and the debt of $2000 to Camac. And at the same time, Randel requested him to go to New Castle and reassign the part of said judgment which had been assigned to him as aforesaid; and that he, Randel, would then execute the power to Brown to enable him to transfer said two certificates of debt to himself. And accordingly, on the 22d of the same month, he at New Castle reassigned to Randel said sum of $2000, part of said judgment, and received from him the power of attorney, authorizing him to transfer said two certificates of debt, numbered 34 and 35, to himself, or any other person.

And in answer to the interrogatories in the bill, Brown says, "that he did not receive said certificates and power of attorney, in trust and confidence, in the manner and under the circumstances therein set forth, but absolutely, as an unqualified transfer, in payment of a debt due to him, by the complainant, and distinctly admitted by him, and to enable him, the respondent, to pay William H. Camac the amount of his, the respondent's, acceptance, as before stated; and that said respondent has an absolute and unqualified interest in the certificates, to the whole amount of their principal and interest, and that he does not hold them as trustee for the complainant, nor any other person, but in his own right, and for his own use.

"And that he did refuse to deliver said certificates to the complainant, and did actually transfer said certificates to himself, on Monday, the 24th day of October last; and that he did not place said certificates before the directors of the Schuylkill Bank, on Monday, the 24th, or Tuesday the 25th of October last. That touching the disposition your respondent has made of the said certificates, he says, that they still stand in the name of your respondent, and were surrendered to this honourable court, on the presentation of the complainant's bill of complaint." To the answer the complainant filed a general replication. And, after time had been allowed the parties to take depositions, the court referred the case to three masters, with special instructions.

The masters after a very thorough examination of the evidence in

the cause, reported against the claim of Brown for separate compensation for time; but allowed him the two and a half per cent. commissions, claimed in his answer, amounting to $5659 64, as compensation for all services rendered. Both parties excepted to the report. Brown, to that part of it which disallowed his claim for separate compensation for time; and Randel excepted to that part which allowed to Brown two and a half per cent. on the amount of the judgment against the canal company.

The court overruled these and all other exceptions, confirmed the report of the masters, and rendered a decree in favour of Brown for the amount allowed by the masters, with interest from the fifth day of May, 1840, amounting together to the sum of $6136, to be paid out of these two certificates. From this decree both parties have appealed to this court.

The right of Brown to compensation for time, and his right to commissions on the amount of the judgment, are both involved in his assertion of the more general right, to be compensated, for all his services, out of these certificates. The principal questions, therefore, which we deem it necessary to examine are, 1st. Were the certificates delivered to Brown in payment of a debt to himself, and to pay the debt to Camac? And if they were not so delivered; then, 2d. Had Brown such a legal or equitable interest in the certificates as authorized the decree of the court below? A just solution of these questions depends upon a proper examination of the evidence applicable to them, and the particular circumstances under which the witnesses acquired a knowledge of the facts they have deposed to.

Shortly after the bill was filed, and before Brown had filed his answer, he went to Delaware to ascertain what evidence he could obtain from persons having a knowledge of the services he had rendered to Randel. And from the inquiries he made of several of the witnesses, and the disclosures made to them, of the nature of his controversy with Randel, it is reasonable to suppose, that he intended, at that time, to rest his defence upon the amount and value of his services only, and that he had not then thought of claiming the certificates, as having been delivered to him in payment of a debt due for those services. The depositions of four of those persons are found in the record; T. B. Roberts states, in his deposition, that Brown asked him what evidence he could give, as to the value of his services, while with Randel, stating, that the witness was aware of his having been for years doing business for him.

The witness then says, that Brown stated to him, "that the certificates had been put into his hands by Mr. Randel; to raise money upon them, to pay certain debts of Randel's in Philadelphia; one of which he mentioned was to Mr. Camac; I think, he stated himself, under some obligation to have paid by Mr. Randel; and another debt to Mr. Charles Ingersoll; he did not state that the balance was for himself. He said he had exerted himself to negotiate the certificates to several persons, but had not succeeded;" "that Mr. Randel wished him to return the certificates to him, but he had refused to do so, until Mr. Randel settled certain debts he owed."

A. C. Gray, to whom Brown applied, for the purpose of getting his services as commissioner to take depositions for him, in this suit, says, Brown stated, "that he had received a transfer of $10,000 from Randel of the canal's debt, for the purpose of raising money; with which Mr. Randel wished to pay his debts; he stated also, that Mr. Randel owed him money for services, which he had rendered him, during the long litigation which had taken place between Randel and the canal company. In consequence of these things, he had determined to hold on to these certificates, as the only means to enforce the settlement of his claims."

Thomas Janvier, another of these witnesses, states, that when Brown applied to him to ascertain what testimony he could give in this case, Brown stated that Randel had promised to pay him two and a half per cent. on the judgment against the canal company. The witness replied, that his testimony might operate against him, as the only claim he had ever heard him assert, was, that he intended to make Randel pay him $2000 for his services. Janvier then says, "that in the course of the conversation he gave me a history of the transaction, upon which this suit is founded; and told me that Randel had given him these certificates, which are now in controversy, for the purpose of negotiating a loan, to pay certain debts he had contracted—debts due to Mr. Camac, Mr. Charles Ingersoll, and himself; so far I recollect positively. I am certain, from the information of Mr. Brown, that the certificates were given for the purpose of negotiating a loan, to enable Randel to pay certain creditors. I am certain he named Mr. Camac, Mr. C. Ingersoll, and himself as creditors."

Cornelius D. Blaney, the fourth witness, says, he does not recollect that Brown stated how the certificates came into his hands; in other respects his testimony is, substantially, the same as that of the other

three witnesses; and it appears, that he was present at the conversation between Brown and the witness, Roberts.

After collating this evidence with clearness and ability, the masters proceed to say, "It is remarkable, that to none of these persons did the respondent state the fact, that he had transferred these certificates into his own name; it is remarkable also, that if, at that time, he did entertain the same clear and positive conceptions of his rights, which is set forth in the answer, he did not simply and plainly state that right, and say, "they (the certificates) were given in payment, or part payment of my own claim, and of my liability to Mr. Camac." We cannot close our minds to the force of the testimony of these four persons. It has been ably urged, that evidence gathered from the declarations of a party is unsafe, peculiarly liable to the effects of misapprehension, of inattention, of defect of recollection—that a word omitted, or displaced, may change the whole character of the declaration. We have felt the force of the argument, but it does not prevail against the influence of the concurring testimony of four intelligent and respectable men, giving a very uniform account of the respondent's representation of his own case; and, in relation to the question of trust, giving such a narration as to lead to one and the same result. We have observed too, that it is the same species of evidence, upon which the respondent asserts his alleged contract with the complainant, which contract he states in his answer, in the words or declarations of the complainant, alleged to have been uttered to himself, at a time much less recent than his own declarations to the witnesses."

"The testimony of these witnesses then, establishes, in our opinion, and accordingly we find, and so report,

"1. That the delivery of the certificates by the complainant to the respondent was not absolute, but upon a trust.

"2. That the trust was to raise money.

"3. That of the money so to be raised, part was to be paid to Mr. Camac; and that as to this part, the respondent had a direct interest in the execution of the trust, in consequence of his acceptance of the draft drawn in favour of Mr. Camac, referred to in the answer, and of his re-transfer of the interest in the judgment upon which the draft was drawn.

"4. That another portion of the money so to be raised was to be paid to Mr. C. Ingersoll.

"5. That no express appropriation of the balance, or any part

2 N

thereof, was made at the time by the complainant in favour of the respondent."

We concur entirely with the masters in their reasoning, and in the conclusions they have arrived at, upon this testimony, except as to the supposed interest of Brown in the execution of the trust, mentioned in the third specification. Upon that we shall have occasion to comment, in another part of this opinion. This evidence sustains the allegations of the bill, fully, and contradicts the answer, as to the objects and purposes for which the two certificates were delivered by Randel to Brown. There is, therefore, no further pretence to say, that Brown received the certificates in payment of a debt to himself, and for the purpose of paying the debt to Camac. And this evidence establishes another material fact in this case; and that is, that Brown had no interest or property in the certificates before they were delivered to him by Randel; and whether he acquired any in them afterwards, leads us to the consideration of the second question. Had Brown such an equitable interest in the certificates as authorized the decree of the court below?

In the third specification before referred to, the masters reported that Brown had a direct interest in the certificates, on account of his acceptance of Randel's order in favour of Camac, and his having relinquished to Randel his interest in the judgment. It is difficult to ascertain upon what ground it was assumed, at the date of the report, that Brown had an interest in these certificates. The order was drawn upon a special and contingent fund, which might never be received; and until received, Brown was not liable to pay. There is no proof in the cause that can be relied upon, to show on what consideration the re-assignment was made; unless the statements in Brown's answer are to be received as evidence. When the answers of the defendant are directly responsive to the allegations of the bill, they amount to positive proof. But in this case there is no allegation in the bill, in relation to this assignment or re-assignment. Brown, in giving a history of the transactions between him and Randel, sets up in his answer this sum of $2000, as having been assigned to him in part payment of his services; and in another part of his answer, he states, that upon receiving the certificates and power of attorney, at the request of Randel, he re-assigned his interest in the judgment to him.

This being clearly matter in avoidance, it is entitled to no more consideration, as evidence, than are the allegations of the bill. There

Randel *v.* Brown.

is no evidence, therefore, that the re-assignment was made in consideration of the delivery of the certificates by Randel to Brown. But there is strong presumptive evidence, that it was made in consideration of the payment of the order to Camac by Randel, or of his promise to Brown, that he would pay it; for it appears by the report of the masters, that it was admitted by the parties, and the counsel on both sides, that the amount of the order had been paid by Randel to Camac after the commencement of this suit.

But if Brown had even acquired a valid lien on the certificates, on account of the acceptance of the order, and the re-assignment of his interest in the judgment, the payment of the order by Randel, pending the suit, extinguished the lien, and no decree ought, on account of this supposed lien, to have been rendered in favour of Brown; for it is the rights of the parties, at the time the decree is rendered, that ought to govern the court in rendering the decree. In either aspect of the case, however, Brown's right to these certificates is reduced to naked possession; and, since his refusal to restore them to Randel, his possession has been fraudulent.

It has been contended, by Brown's counsel, that, as the masters have reported that a large amount was due from Randel to Brown, and that Randel had parted with all the rest of his certificates of funded debt; that, therefore, Brown had a right to payment out of the certificates in controversy in this case. In support of this proposition, they relied on the case of Handy and Harding, 11 Wheat. 103.

The bill, in that case, stated that Wheaton, under whom the complainants claimed, as heirs-at-law, about the year 1802, began to exhibit symptoms indicating loss of intellect, and soon became incompetent to the management of his estate. Under these circumstances, it was agreed among his children, that Handy, who had married his daughter, should endeavour to take his estate out of his hands, and preserve it for the benefit of his heirs-at-law. That it was agreed, that Wheaton should be prevailed on to convey the real property to Handy, for a nominal consideration, who should forthwith execute an instrument of writing declaring that he took and held the same in trust. 1st. To provide a decent support for the grantor, during his life; and after a full remuneration for his expenses and trouble, in that respect, to hold the residue of the estate for the benefit of the heirs-at-law. Handy procured the conveyance from Wheaton, and entered upon and possessed the property till his death, but refused to execute the declaration of trust.

The bill then prayed for an account; and that a decree might be rendered, exonerating the estate from the deed to Handy, after satisfying his just claims, &c.

The answer denied that Wheaton was incapable of conveying, when the deed was made. It denied also that the defendant purchased as a trustee; and averred, that he was a purchaser for a full and valuable consideration.

The Circuit Court decreed that the deed should be set aside; and that an account should be taken of the receipts and disbursements of Handy, and that he should be credited for all advances made, and charges incurred for the maintenance of Wheaton during his life, and for repairs and improvements made on the estate. This part of the decree was affirmed by the Supreme Court. Handy's possession of the estate was consistent with the intention of the parties; the advances made and charges incurred, for the maintenance of Wheaton, were according to their agreement; and the repairs and improvements made, preserved the estate, and enhanced its value. Thus far Handy executed the trust fairly, and thereby acquired a lien on the funds in his hands, arising from the rents and profits; nor were these acts tainted by his subsequent fraud, in refusing to excute other parts of the trust; and besides the complainants in their prayer for relief authorized the court to allow Handy his just claims against the estate. This case does not, therefore, give any support to the proposition assumed by the counsel of Brown.

There is no parallel between these cases, as a brief comparison will show. Brown's possession of the certificates, after refusing to restore them to Randel, was not only fraudulent, but wholly inconsistent with the contract with Randel; and in violation of the trust upon which he received them. And Randel, so far from authorizing the court to allow Brown's claim out of the certificates, stated positively in his bill, that he owed him nothing. The proof shows conclusively, that Brown had neither property nor interest in the certificates, before they were delivered to him by Randel. Unless he can show, therefore, that he has a lien on them, he can neither hold them as security for the payment of the claims set up in his answer, nor is he entitled to payment out of them, at law or in equity. To create a lien on a chattel, the party claiming it must show the just possession of the thing claimed; and no person can acquire a lien, founded upon his own illegal or fraudulent act, or breach of duty; nor can a lien arise, where, from the nature of the contract between the parties, it

would be inconsistent with the express terms, or the clear intent of the contract. For example, if the goods were deposited in the possession of the party for a particular purpose, inconsistent with the notion of a lien, as to hold them or the proceeds for the owner, or a third person. Story on Agency, 73, 74, 75; Lamprier v. Pasley, 2 Term R. 485; Cranston v. The Philadelphia Insurance Company, 5 Bin. 538; Turno v. Bethune, 2 Desau. 285; Jarvis v. Rogers, 15 Mass. R. 389, 395; Weymouth v. Bowyer, 1 Vesey, Jun. 416; Taylor v. Robinson, 8 Taunt. R. 648; Gray v. Wilson, 9 Watts, 512; Madden v. Kempster, 1 Camp. 12; Crockford v. Winter, 2 Camp. 124.

In the case of Madden v. Kempster, Lord Ellenborough said, "The defendant being under an acceptance for Captain Hart, whose agent he had been, might have retained a sum of money to answer that acceptance. But the plaintiff is entitled to recover this sum of money, the defendant having obtained it by misrepresentation. He mentioned nothing of the acceptance, he obtained it as a balance when no balance was due to him. He cannot, therefore, set up the lien to which he might otherwise have been entitled." Lord Ellenborough held the same doctrine in the case of Crockford v. Winter; and the same doctrine was held in Taylor v. Robinson, 8 Taunt.

In this case of Madden v. Kempster, it is admitted that Kempster would have had a good lien on the £60 if he had obtained the money honestly, and in the course of business. But having obtained it by misrepresentation he was not permitted to set up the lien, to which he might otherwise have been entitled. How then, can Brown set up a lien on these certificates, holding possession of them as he does, by just as gross a fraud? There is no aspect in which the question can be placed, consistently with the evidence and the authorities above cited, that will justify the decree in his favour. To permit this decree to stand would be to sanctify fraud, and to allow Brown, by taking advantage of his own wrong, to obtain compensation for his services in a court of chancery, upon a case purely cognisable in a court of law, the decree of the Circuit Court is, therefore, reversed, and the cause is remanded to the Circuit Court with directions to enter a decree for the plaintiff, conformably to this opinion, and that the defendant pay costs in both courts.

ORDER.

Randel v. Brown.

This cause came on to be heard on the transcript of the record

from the Circuit Court of the United States for the Eastern District of Pennsylvania, and was argued by counsel.    On consideration whereof, It is now here ordered and decreed by this court, that the decree of the said Circuit Court be, and the same is hereby reversed with costs ; and that this cause be, and the same is hereby remanded to the said Circuit Court, with directions to that court to enter a decree for the complainant conformably to the opinion of this court, and that the defendant pay the costs in both courts.

#### ORDER.

Brown *v.* Randel.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Pennsylvania, and was argued by counsel.    On consideration whereof, It is now here ordered, adjudged, and decreed by this court, that this appeal be, and the same is hereby dismissed with costs ; and that this cause be, and the same is hereby remanded to the said Circuit Court with directions to that court to proceed therein conformably to the opinion of this court in this case on the appeal of the complainant.