**MARSH FORK COAL CO. v. LUCAS, Commissioner of Internal Revenue.**

No. 2887.

Circuit Court of Appeals, Fourth Circuit. June 14, 1930.

Theodore B. Benson and Sidney P. Simpson, both of Washington, D. C., for petitioner.

A. D. Sharpe, Sp. Asst. to the Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to the Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Robert L. Williams, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

84

E. L. Greever, of Tazewell, Va. (Hines, Rearick, Dorr, Travis & Marshall, of New York City, A. M. Belcher, of Charleston, W. Va., O. W. Carlson, of Salt Lake City, Utah, A. J. Curran, of Baltimore, Md., Charles A. Goodwin, of Morgantown, W. Va., Goody-koontz & Slaven, of Williamson, W. Va., Lindsay, Young & Young, of Knoxville, Tenn., A. M. Liveright, of Clearfield, Pa., W. H. McGinnis, of Beckley, W. Va., E. J. Mc-Vann, of Washington, D. C., and T. S. Talia-ferro, Jr., of Rock Springs, Wyo., on the brief), as amici curiæ, on behalf of National Coal Association and others.

Before PARKER and NORTHCOTT, Circuit Judges, and HAYES, District Judge.

PARKER, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals reported in 11 B. T. A. 685. A number of questions were decided by the Board, but only one is presented to us by the petition, i. e., whether the Board was correct in refusing to allow petitioner to deduct from gross income for the year 1920 expenditures amounting to $28,895.85 for electric locomotives, mine cars, and steel rails. The Board held that these were capital expenditures, and refused to allow their deduction. Petitioner contends that they were not capital expenditures, as they did not increase output, decrease cost of production, or add to the value of the mine, but were made solely to maintain normal production, and were properly treated as maintenance items which should be charged to operating expense and deducted from gross income.

■■ At the time of the expenditures, petitioner's mine had been fully developed, and had been operated for a number of years. Workings had reached a distance of one and one-half miles from the head house, and more cars, locomotives, and trackage were necessary to maintain the normal output. The normal life of all of the equipment purchased exceeded one year, that of the cars being about five years, and that of the electric locomotives from eight to ten years. Petitioner contends that, although this is true, the purchase of the equipment did not add, and was not intended to add, anything to the value of the mining property, that its purchase was made necessary by the removal of the coal and the recession of the working faces; and that its installation was nothing more than an expense incident to the removal of the coal. We agree with the contention of petitioner.

Section 234(a) (1) of the Revenue Act of 1918 (40 Stat. 1077) provides that in computing net income there shall be deducted from gross income "all the ordinary and necessary expenses paid or incurred" during the year in carrying on the business. Section 215(b), 40 Stat. 1069, throws light on what is to be considered as ordinary and necessary expense by specifying among items not deductible "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." In determining, therefore, whether an expenditure should be classed as an item of expense and deducted from gross income or as an improvement or betterment and charged to capital, regard should be had to whether the expenditure was made "to increase the value of any property or estate." This criterion is not only implied in the language of the act, but is in accord with established accounting practice. Mr. Paul Joseph Esquerre, in his Applied Theory of Accounts, p. 226 (quoted in the opinion in the appeal of Goodell-Pratt Co., 3 B. T. A. 30, 35), says:

"*Capital Expenditures.* When subjected to a theoretic analysis, this term [capital expenditures] appears to apply to such expenses as, in the aggregate, represent the cost of the increased earning capacity of the enterprise as a whole or of particular parts thereof, which has been secured over the earning capacity known to exist before the said expenses were incurred."

And the bulletin of the Federal Reserve Board on the "Verification of Financial Statements," as revised in 1929, at page 12, lays down the following practical rule:

"(b) The auditor, before approving additions, should satisfy himself that they were made with the object of increasing the earning capacity of the plant and that they are not repairs or replacements of fixed property. Changes in the product and capacity of the plant should receive careful consideration."

Ordinarily it is true that the purchase of machinery having a life greater than one year is to be charged to capital and not to expense, for ordinarily such machinery is purchased either to increase production or to decrease cost and in either event to add to the value of the property. Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that pur-

pose. They are made solely for the purpose of maintaining the capacity of the mine as the working faces of the coal recede. They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length.

It is possible, of course, to think of the increased trackage and the increased number of mine cars and locomotives made necessary by the lengthening tunnels as an increase of the capital investment in the mine; but the trouble is that this theory leads to the ridiculous result that, with the increase of investment, the property becomes less valuable, and that, when the investment is complete, the property is practically worthless. It is much more reasonable, we think, to consider expenditures for trackage, cars, and locomotives to maintain normal output as being an expense necessitated by the removal of the coal which has lengthened the tunnels, and an expense which, in any fair system of accounting, should be charged against the coal so removed.

When an operator has removed sufficient coal to extend his tunnels so that he cannot maintain production with the equipment which he has, he must as a matter of course lay down more track and put in more cars and locomotives. The question is, Shall the expense thereby incurred be charged against the coal, the removal of which necessitated the expenditure to maintain normal operation, or against the coal yet unmined? We think it is but fair to charge against the coal which has been mined the expense which its removal has necessitated. We think, also, that this is the only practicable method of accounting. To capitalize the expenditures made to maintain normal output means that the cost of removal is pyramided against the coal farther back in the mine, with the result that the coal nearest the head house will appear to have been mined at abnormal profit and that farther back at a loss.

The fact that the trackage laid and the cars and locomotives installed may last for a number of years is, we think, immaterial. However long they may last in the mine, they are but maintaining the mine's capacity, which would otherwise have been impaired by the lengthening of the tunnels due to the removal of the coal. While not repairs, they are in the nature of repairs, in that they are necessary to maintain the operation of the mine at the level of normal production. As suggested by counsel, a new axle on an automobile is no less a repair and chargeable to expense because it has a normal life of more than a year.

In considering what should be charged to expense and what to capital investment, regard should be had for established accounting practice. This is recognized by the statute itself, which provides in section 212(b), 40 Stat. 1064, that the income of the taxpayer shall be computed "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer," except where "the method employed does not clearly reflect the income." Article 23 of Regulations 45, adopted pursuant to the statute, provides that "approved standard methods of accounting will ordinarily be regarded as clearly reflecting net income." And, in applying the statute, the Board of Tax Appeals has repeatedly resorted to standard accounting practice in determining what is properly chargeable as an expense item and what as a capital expenditure. See Sneath Glass Co., 1 B. T. A. 736; Goodell-Pratt Co., 3 B. T. A. 30; American Seating Co., 4 B. T. A. 649; Libby & Blouin, Ltd., 4 B. T. A. 910.

Looking then to the authorities on accounting, we find that the Committee on Standard System of Accounting and Analysis of Production of the National Coal Association, on page 8 of its report in 1919, covered the matter here involved in the following language:

"The drawing of distinctions between capital and operating expenditures, in the accounting involved in permanent enterprises, is a favorite field for discussion among accountants, but in the case of coal mining or other wasting enterprises, experience teaches that the field for discussion, if indeed there be any, is extremely limited.

"After a coal mine has been developed and equipped to its contemplated or possible capacity, it is a constant consumer of material and supplies and equipment, which, though nominally of a durable nature, are subject to destructive wear and tear, by reason of the uses to which they are put, and all these appliances must be kept in repair to do their work or the output can not be maintained.

"Mules and pit cars are constantly worn out, and have to be replaced, and as the working faces advance with the exhaustion of the coal, the length of haul, and consequent time of circulation of pit cars between the working face and dump increases, more motors, mules and pit cars have to be supplied to

maintain the output, and the more motors, mules and pit cars in the mine, the greater expense for replacement and repairs.

"Also, with the advance of workings, more rails have to be laid and more copper wire or other conductors put up to carry power to the working faces to maintain the output. They remain in place until the mine is exhausted, and when they are recovered have but little net scrap value. In fact, any net salvage is relatively very small.

"The fact that these expenses are continually recurrent and practically a fixed factor in the cost of production per ton from year to year, proves that they constitute an operating rather than a capitalizable expense."

Mr. William B. Reed in "Bituminous Coal Mine Accounting" (1922), quotes with approval the rule as stated by the committee, see pages 84, 85, and at page 201 lays down the following among the rules for preparing a balance sheet for a mine:

"Charge to this account (Mine Plant and Equipment) the cost of Mine Buildings and structures, machinery, equipment, etc., purchased or constructed subsequent to February 28, 1913, or at the fair market value as at March 1, 1913, if purchased or constructed prior to that date. This account includes tipples, power houses, office buildings, side tracks, reservoirs, steam and water lines, machinery and equipment, mine cars, motors, steel rail, wiring, and all equipment necessary in the first instance to bring the mine into an operating condition.

"After the mine has been developed to its regular normal output capacity all additional expenditures for minor items of plant and equipment, necessary to maintain but not to increase production, such as motors, mules, mine cars, steel rail, copper wire, etc., should be charged to operation."

Mr. R. V. Norris, member and chairman of the Coal Sub-Committee of the American Institute of Mining and Metallurgical Engineers, and at one time Engineer to the United States Fuel Administration, in a lecture at Columbia University in 1921 (The Federal Income Tax, Columbia University Press 1921, p. 243) stated the rules applicable as follows:

"*Capital Charges.* There should be charged to capital account:

"a. The value of the mineral in the ground;

"b. The value of the development;

"c. The value of mechanical equipment inside and outside and

"d. The value of plant, buildings, dwellings, waterworks, sewerage, roads, railroads, plant facilities and the like.

"All to *attain* but not to *maintain* output.

"*Operating Charges.* There should be charged to operation all costs of production, all development, plant and equipment necessary to maintain output. All overhead expenses necessary in carrying on the business, all local taxes, depletion and depreciation.

"*Development.* The cost of the development of a property to its intended output is properly chargeable to capital. All further development to maintain output is properly operating expense. A mine may be considered developed when there are sufficient working places to produce the designed output, and sufficient entry work in progress to replace exhausted areas and maintain output. Sufficient advance development should be maintained to assure beyond question the maintenance of output under unfavorable conditions.

"*Plant and Equipment.* All plant and equipment necessary to bring the property to capacity is properly a capital charge. All additions, renewals and extensions necessary to maintain output should be charged to operation."

The English accounting practice follows the same rule. It is thus stated by the Council of the Institution of Mining and Metallurgy (Dicksee, "Mines Accounting and Management," p. 78):

"*After the producing stage is reached,* no expenditure should be charged to Capital Account except large special items, such as (1) Purchase of additional property; (2) Sinking of new main shafts to reach ore bodies; (3) Erection of additional buildings, machinery, plant, or surface works which may be necessary either to increase output, to improve recovery, or to decrease costs. Such items of capital expenditure should bear their proportion of the administration and general charges. If any existing shafts, machinery, plant or buildings should be entirely superseded and replaced, the cost of the old items should be written off Capital to Profit and Loss either at once (if small) or in the case of large items by installments spread over as short a period as the responsible engineer may recommend. All repairs, maintenance and replacements of minor machinery and plant should be charged to working costs."

See, also Gardiner "Coal Production Costs," 2 Bulletin of National Association of Cost Accountants; McCluskey "Anthracite

Mine Accounting," Journal of Accounting, vol. 32, p. 16; Dickinson, "Accounting Practice and Procedure," 1914, p. 154; Southworth and Phillips, "Anthracite Coal and the Income Tax," in the Internal Revenue News, vol. 2, No. 7, p. 16.

This standard accounting practice has been approved as proper by the Revenue Department in regulations issued under the Revenue Act in question and subsequent acts. Article 222 of Regulations promulgated March 5, 1920, was as follows:

"Art. 222. *Charges to Capital and to Expense in the Case of Mine.*—In the case of mining operations all expenditures for plant, equipment, development, rent and royalty prior to production, and thereafter all major items of plant and equipment, shall be charged to capital account for purposes of depletion and depreciation. After a mine has been developed and equipped to its normal and regular output capacity, however, the cost of additional minor items of equipment and plant, including mules, motors, mine cars, trackage, cables, trolley wire, fans, small tools, etc., necessary to maintain the normal output because of increased length of haul or depth of working consequent on the extraction of mineral, and the cost of replacements of these and similar minor items of wornout and discarded plant and equipment, may be charged to current expense of operations."

This article was amended on January 28, 1921, to read as follows:

"Art. 222. *Allowable Capital Additions in Case of Mines.*—(a) All expenditures for development, rent, and royalty in excess of receipts from minerals sold shall be charged to capital account recoverable through depletion, while the mine is in the development stage. Thereafter any development which adds value to the mineral deposit beyond the current year shall be carried as a deferred charge and apportioned and deducted as operating expense in the years to which it is applicable.

"(b) All expenditures for plant and equipment shall be charged to capital account recoverable through depreciation, while the mine is in the development stage. Thereafter the cost of major items of plant and equipment shall be capitalized, but the cost of minor items of equipment and plant, necessary to maintain the normal output, and the cost of replacement may be charged to current expense of operation."

As promulgated February 15, 1922, it read as follows:

"Art. 222. *Allowable Capital Additions in Case of Mines.*—(a) All expenditures for development, rent, and royalty in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion, while the mine is in the development stage. Expenditures made in order to maintain the mine at its normal output shall be deducted as an expense in the year in which the expenditure is made or accrues. Any expenditure for extraordinary development and equipment, such as stripping, shaft sinking, tunneling, and other work beyond that necessary to maintain the mine at its normal production or output, should be carried forward and apportioned and deducted as an operating expense in the years to which it is applicable.

"(b) All expenditures for plant and equipment shall be charged to capital account recoverable through depreciation, while the mine is in the development stage. Thereafter the cost of major items of plant and equipment shall be capitalized, but the cost of minor items of equipment and plant, necessary to maintain the normal output, and the cost of replacement may be charged to current expense of operation. See articles 103, 293, and 582."

On October 6, 1924, it was slightly changed and promulgated as article 224 of Regulations 65.

■ It will be noted that, while the language of each of these regulations differs slightly from the others, all provide that the cost of minor items of equipment, such as we are considering here, necessary to maintain normal output, shall be charged to current expense of operation. The Revenue Acts of 1921 (42 Stat. 227), 1924 (43 Stat. 253), and 1926 (44 Stat. 9), re-enacted in identical language the provisions of the act of 1918 relating to the deduction of expense and the nondeductibility of improvements. And, under a well-settled rule of law, the re-enactment by Congress of the provisions of the statute, which had thus received a settled construction by the officers of the executive department charged with carrying them out, must be construed as an approval by Congress of that construction. N. Y., N. H. & Hartford Railroad Co. v. Interstate Com. Commission, 200 U. S. 361, 401, 26 S. Ct. 272, 50 L. Ed. 515; Copper Queen Mining Co. v. Arizona Board, 206 U. S. 474, 479, 27 S. Ct. 695, 51 L. Ed. 1143; National Lead Co. v. U. S., 252 U. S. 140, 146, 40 S. Ct. 237, 64 L. Ed. 496; Heiner v. Colonial Trust Co., 275 U. S. 232, 235, 48 S. Ct. 65, 72 L.

Ed. 256; Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457; U. S. v. Jackson, 280 U. S. 183, 50 S. Ct. 143, 74 L. Ed. 361.

The decisions of the Board of Tax Appeals are not in accord. In the first case decided by it, the appeal of the Bruin Coal Co., decided in 1924, 1 B. T. A. 83, it allowed the deduction as expense of the cost of rails, pipe, and pumps purchased for maintaining normal output and quoted with approval article 222 of Regulations 45. In the following year, without questioning the principle applied in the Bruin Case, it disallowed the deduction as expense, and we think properly, of expenditures made in changing from one type of operation to another for the purpose of reducing expense. Winifrede Coal Co., 1 B. T. A. 566; Henry Coal Co., 2 B. T. A. 1331. In 1926, however, in the appeal of the Union Collieries Co., 3 B. T. A. 540, the Board refused to follow article 222 of Regulations 45 as an authoritative interpretation of the statute, and held that the cost of equipment such as that involved here, having a normal life of more than one year, was not deductible as expense. This decision has been followed by the Board in a number of cases, and was followed by it in the decision of the case at bar.

For the reasons stated, we think that the decision of the Board was erroneous; and we are sustained in this conclusion by the recent decision of the Circuit Court of Appeals of the Fifth Circuit in U. S. v. Roden Coal Co., 39 F.(2d) 425, 426. In that case, the items involved were wheels for mine cars, water pipe, and steel rails. In holding these deductible and approving article 222 of Regulations 45, the court, speaking through Judge Foster, said:

"In view of the conclusions of the District Court that the mine had been completely developed before the purchase of the various items, that they were necessary to maintain the regular and normal output, that none of them increased the output or decreased the cost of production or increased the capital value of the property, they could hardly be considered improvements. The regulation appears to be reasonable and valid, and, giving it effect, the items were properly deducted as necessary and normal expense to be charged to operations. In the case of a coal mine, there is always the danger that the coal will be depleted to an extent that will make the operation of the mine not profitable. In that event, there would be no future years in which to charge off a proper depreciation of

items of equipment the expenditures for which did not increase the value of the mine as a whole. In fairness to the taxpayer, he should be allowed to charge them to expenses, as is permitted by the above regulation."

The decision of the Board with respect to the items involved in this appeal will accordingly be reversed, and the case will be remanded for further proceedings not inconsistent herewith.

Reversed.