## WILLIAMS POCAHONTAS COAL CO. v. BERWIND LAND CO.
### No. 3787.

Circuit Court of Appeals, Fourth Circuit.
April 2, 1935.

J. Randolph Tucker, of Welch, W. Va. (Joseph M. Crockett and Charles A. Tutwiler, both of Welch, W. Va., on the brief), for appellant.

John Wehrle and P. H. Murphy, both of Charleston, W. Va., for appellee.

Before NORTHCOTT and SOPER, Circuit Judges, and GLENN, District Judge.

NORTHCOTT, Circuit Judge.

This is a suit in equity brought in the District Court of the United States for the Southern District of West Virginia, in December, 1932, by the appellee, hereinafter referred to as the plaintiff, against the appellant, hereinafter referred to as the defendant. Evidence was taken and in June, 1934, the court below entered a decree in favor of the plaintiff from which decree this appeal was brought.

The facts as found by the judge below show that by lease dated April 1, 1929, the New River & Pocahontas Consolidated Coal Company leased to the defendant all the coal remaining in a certain seam of coal known as No. 12, or the War Creek Seam, underlying three certain parcels of land situate in the county of McDowell and state of West Virginia, and fully described and set out in said lease. The quantity of said lands aggregated 1,853.75 acres.

By deed dated on the 1st day of January, 1930, the New River & Pocahontas Consolidated Coal Company conveyed to the plaintiff herein all such three parcels of land, together with all its rights as lessor in such lease.

Under the terms of the lease, the defendant agreed to pay, during the continuance thereof, a royalty of 15 cents for each and every ton of 2,240 pounds of run of mine coal mined thereunder, and such royalty was to be paid monthly, on the 20th of each month, for the tonnage mined during the preceding month. In addition thereto, the lessee was to pay, beginning on the 1st day of April, 1929, as a fixed or minimum rent for the third year, and each year thereafter, the sum of $24,000, in equal monthly installments; the installments accruing during the previous months.

It was further agreed that during the continuance of the lease, the defendant was to pay promptly when due all taxes, levies, and assessments upon the entire fee simple estate in such three parcels of land, together with all the improvements thereon, including not only the estate of the lessee therein, but the entire estate of the lessor therein, so that the lessor should be relieved from paying any taxes, levies, or assessments on such tracts of land or any of the improvements thereon.

This lease was a renewal and consolidation of three leases, theretofore made by the lessor, of different sized tracts of land,

two of which leases had been made to the defendant, and the third had been made to the Underwood Pocahontas Coal Company, an allied company. The defendant had mined large quantities of this seam of coal under the former leases to it, but the third lease had had very little, if any, coal mined under it, although there had been paid by the Underwood Company, as a minimum rental, the sum of $36,000 thereunder, for which no coal had been mined.

It was agreed that this lease should continue, unless sooner terminated by its terms, until all the coal, in the No. 12 or War Creek Seam measuring two feet and six inches or over in thickness, should have been mined and removed. It was further provided that in the event the lessee desired to mine coal in such seam less than two feet and six inches in thickness, then the term of such lease should continue for such further period as would be reasonably necessary to permit such mining by proper and diligent methods.

This lease was acknowledged by the defendant on the 11th day of June, 1929, and by the plaintiff's predecessors in title on the 12th day of June, 1929.

Under the terms of this lease, the defendant proceeded to mine coal continuously thereunder, and had full possession thereof until the 13th day of December, 1932.

By a notice dated on the 29th day of November, 1932, and served upon the defendant on the 30th day of November, 1932, the plaintiff claimed, and in such notice said that it elected to declare, a forfeiture of such lease, pursuant to the terms therein set out, and claimed that for rentals and royalties there was unpaid by the defendant to the plaintiff the sum of $9,677.86, and that there was unpaid for taxes for the year 1932 the sum of $3,138.49, making an aggregate of $12,816.35. Such notice further informed the defendant that it would insist upon all the personal property, belonging to the defendant and situate on the leased premises, remaining thereon until the amounts of money due the plaintiff should have been fully paid.

The next step was a notice served upon the plaintiff by the defendant on the 13th day of December, 1932, which, in substance, asserted that all the coal of the No. 12 or War Creek Seam, measuring two feet six inches or over in thickness, underlying the land so leased, had been mined and removed from the premises, and further set out that by reason of the claim of the defendant for the sum of $36,000, paid by the Underwood Company, all royalties and taxes, which, by the terms of the lease the defendant had agreed to pay, had been fully paid and satisfied, and further the defendant claimed that by reason thereof the lease was terminated, and that it intended to forthwith abandon the same, and that it would, within the time of ninety days mentioned in the lease, from the date of the receipt of this notice by the plaintiff, remove all of its engines, boilers, machinery, and other loose personal property from such premises.

On the 28th day of December, 1932, the plaintiff, by its agent, took possession of the leased premises, and still has such possession.

It is agreed between the parties that the lease is now terminated, and in its bill the plaintiff prayed for an injunction prohibiting the defendant from removing the unattached personal property from the premises. A temporary restraining order was issued by the court below and later a temporary injunction was granted in accordance with the prayer of the bill.

In its answer the defendant set up that under the terms of the lease, properly interpreted, the court should refuse to take jurisdiction and enter an order directing that the dispute between the parties be submitted to arbitration and prayed for judgment against the plaintiff for the sum of $36,000, less any sums that might be due to the plaintiff under the terms of the lease, and that the defendant should be given possession of the personal property and the right to remove it from the premises. In its answer the defendant also denied that it was liable for the payment of the taxes for the last half of the year 1932. To this answer the plaintiff filed a special replication.

The questions involved are: (1) Is the plaintiff entitled to anything for royalties under the lease over and above the $36,000 paid by the Underwood Company as a minimum rental? (2) Is the defendant liable under the lease for taxes paid by the plaintiff for the whole of the year 1932?

The court below found as a fact that the royalties due and claimed by the plaintiff in its notice of November 29, 1932, were properly due from the defendant to the plaintiff and that additional royalties accruing under the lease, up to and including the 13th day of December, 1932, were likewise due to the plaintiff from the defendant. The court further found that the defendant was liable for the taxes for the en-

tire year 1932 paid by the plaintiff and gave judgment in favor of the plaintiff in the sum of $17,055.47, and found as a matter of law that the plaintiff had a lien upon the loose personal property upon the leased premises and upon the leasehold for the said sum.

The main contention of the defendant was that it had mined all the coal required to be mined under the terms of the lease and based its claim largely upon a letter sent by the president of the defendant company with the lease when it was signed and acknowledged on the 11th day of June, 1929, to the lessor, claiming that such letter thus became, in effect, a part of the lease. The controversy turned upon the interpretation of a phrase "coal two feet six inches and over in thickness." Defendant further contended that a letter dated the 16th day of February, 1929, written by the president of the defendant, and a certain conversation had at that time with the person negotiating the lease on the part of the lessor, became, in effect, part of the lease. A portion of the letter of June 11, 1929, is as follows: "Further referring to your letter of June 5th, I have now had an opportunity to compare the revised draft of lease with the former draft of consolidated lease. I am pleased to note that you have incorporated the amendments substantially as suggested by Mr. Steinbugler. I note, however, that you have made no express definition of 'coal two feet six inches and over in thickness', which the lessee is required to mine. However, in accordance with discussion at our last meeting, it is understood that this is not intended to include a split seam of that thickness, which would make the coal practically unworkable or unmerchantable."

That part of the letter of the 16th day of February, 1929, that is pertinent here is as follows: "The lessee is obligated to dig coal of a thickness as low as thirty inches, so long as such thirty inches of coal has no parting or split, or other impurities. Should the seam be broken up, possibly with more than thirty inches as an aggregate in the various streaks of coal, but the coal could not be mined clean at equal expense as compared with a clean thirty-inch seam, then there will be no obligation on the lessee to so dig it."

This letter apparently was intended to confirm the conversation had between the representative of the defendant and the representative of the then landowner on the 15th day of February, 1929.

In an able and well-considered opinion the judge below analyzed the evidence of the witnesses, the letters and other exhibits offered by both sides, and the admitted facts, and we are of the opinion that he reached the proper conclusion. The outstanding fact supporting the plaintiff's contention was that, at the time of the execution of the lease, the defendant had for a number of years been mining coal on the properties involved and its officers had a full and complete knowledge of all the conditions surrounding the veins of coal involved and the mining of them and yet entered into the lease with open eyes. It seems clearly shown by the record that the defendant had not complied with the terms of the lease in mining all the coal with regard to which there could be no dispute; the pillar coal left standing amounting, according to some of the evidence, to over 400,000 tons. The offer of the officers of the defendant to go ahead with the lease if what they termed "harsh terms" were modified and then indicating as did the president of the defendant in his letter of October 24, 1932, that the operations might be continued if certain royalty payments were waived, the rate of royalties reduced, and the minimum seam thickness required to be mined increased to 42 inches total seam thickness from 30 inches, seems to indicate that the real trouble was the terms of the lease into which the defendant had entered. That the unfavorable conditions surrounding the coal business in the year 1932, together with the conditions at the operation, had something to do with the desire of the officers of the defendant cannot be doubted. It is hard to understand why defendant's president would be willing to go ahead, if the minimum thickness of the seam required to be mined were raised from 30 inches to 42 inches when there was no coal left unmined of the lesser thickness, the 30 inches mentioned in the lease. The terms of the lease are in no sense ambiguous, they are clear, plain, and explicit, and we do not have to look to the surrounding circumstances to interpret the lease. Not only is this true, but the admitted facts connected with the execution of the lease bear out the interpretation clearly indicated by the words used. Under the conditions that existed here, the conversation in February, and the letters written by the president of the defendant, when he returned the executed lease, cannot be read into the lease itself. That instrument is conclusively presumed to contain the agreement between the

parties upon which their minds have met, and the officials of the defendant company entered into the lease with a full and complete knowledge of all the circumstances surrounding the mining of this particular coal. It is only when a written instrument is ambiguous that outside evidence will be received to aid in arriving at a proper interpretation. Scraggs v. Hill, 37 W. Va. 706, 17 S. E. 185; Uhl v. Ohio River R. Co. et al., 51 W. Va. 106, 41 S. E. 340; Sycamore Coal Co. et al. v. Adkins et al., 101 W. Va. 211, 133 S. E. 330; Cline Cola Beverage Co. v. Raleigh Coca Cola Bottling Works, 99 W. Va. 596, 130 S. E. 252; Hopkins et al. v. LeCato, 142 Va. 769, 128 S. E. 55; Home Insurance Co. v. Baltimore Warehouse Co., 93 U. S. 527, 23 L. Ed. 868; Northern Assur. Co. v. Grand View Bldg. Ass'n, 183 U. S. 308, 22 S. Ct. 133, 46 L. Ed. 213.

■■■ That the mining of coal under the lease had become unprofitable, and therefore that the lessee was excused from any further obligation under the lease, is not a tenable position. As this court held in Price v. Pocahontas Fuel Company, 49 F. (2d) 39, it is the duty of a tenant to make examination of the leased premises to determine their adaptability to the purposes for which they are hired. Here the lessee had certainly done this and knew what it had leased. In Hall et al. v. Eversole's Adm'r et al., 251 Ky. 296, 64 S.W.(2d) 891, a Kentucky case very similar to the instant case, the principle is laid down that where lessees bound themselves to mine certain seams of coal, they could not escape obligation by showing that mining had become financially unprofitable.

See, also, Laurence E. Tierney Land Co. v. Kingston Pocahontas Coal Co., 241 Ky. 101, 43 S.W.(2d) 517; Charlow v. Blankenship, 80 W. Va. 200, 92 S. E. 318, L. R. A. 1917D, 1149.

The claim of the defendant as to the right to arbitration seems to have been abandoned and was not urged on appeal.

■■■ The contention of the defendant that it had the right to offset the rent and taxes against the $36,000 paid as a minimum royalty is not sound for the reason that the lease specifically provided (section 6) that the coal agreed to be mined should be exhausted before such an offset could be allowed, and that the credit for the Underwood payment should only be allowed on the last coal in the premises. The judge below has found as a fact (and we think has properly found) that this condition has not been complied with. The same finding of fact defeats the claim made on behalf of the defendant as to any recovery back of the $36,000 minimum royalty paid.

■■■ On the question of the payment of taxes by the plaintiff we are of the opinion that the judge again reached the proper conclusion. Under the West Virginia statute (Code W. Va. 1931, 11-10-1), while the privilege was accorded to the property owner to pay the taxes in two installments, the taxes for the entire year became a lien upon the property upon the first day of the year. The privilege accorded by the State Legislature to make the payments in two installments could not change the binding terms of the lease which required the defendant to pay the taxes due.

■■■ The defendant executed the lease with the full knowledge of all the conditions surrounding the seams of coal in the leased property; the stockholders and directors at meetings held on the 25th day of June, 1929, passed resolutions ratifying the new lease, without any objection as to the wording; the lease is presumed to include, in its terms, all the negotiations that lead up to it; the defendant failed to carry the burden devolving upon it of proving that it has complied with the terms of the lease; and the president of the defendant offered to continue operating if the terms of the lease were modified. All these facts sustain the finding of the judge below. Giving to that finding the weight to which it is entitled, we are of the opinion that the decree should be:

Affirmed.