## STONEGA COKE & COAL CO. et al. v. PRICE et al.

### No. 4464.

Circuit Court of Appeals, Fourth Circuit.
Aug. 28, 1939.

Writ of Certiorari Denied Dec. 4, 1939.

See 60 S.Ct. 263, 84 L.Ed. ——.

412

Mercer B. Tate, Jr., of Philadelphia, Pa. (Edward G. Taulane, Jr., and E. H. Molthan, both of Philadelphia, Pa., James L. Camblos, of Big Stone Gap, Va., Robert T. Hubard, of Fayetteville, W. Va., and Montgomery & McCracken, of Philadelphia, Pa., on the brief), for appellant.

Robert G. Kelly, of Charleston, W. Va., (William L. Lee, of Fayetteville, W. Va., and Edward W. Knight, of Charleston, W. Va., on the brief), for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and CHESNUT, District Judge.

PARKER, Circuit Judge.

This is an appeal in a suit in equity brought upon an attachment in the Circuit Court of Fayette County, West Virginia, and removed by defendant into the court below. The parties will be referred to in accordance with the positions there occupied. Plaintiffs are the owners of certain coal lands in West Virginia. Defendant, the Stonega Coke & Coal Co., is the assignee of rights under leases relating to the mining of coal on these lands. The purpose of the suit was to recover rent due under the leases. The defense was that defendant on December 1, 1931, had withdrawn from the leases and had cancelled same in accordance with their provisions because no longer able to conduct mining operations thereunder at a profit.

The case was referred to Hon. Frank A. Lively, a former Judge of the Supreme Court of Appeals of West Virginia, as special master. After extended hearings, he filed his report finding that defendant had no right to withdraw and cancel the leases, under the clauses relied on, because unable as a result of temporary market conditions to continue mining operations at a profit; that the mine on the property was not exhausted but contained 2,300,000 tons of coal; and that defendant did not

NORTHCOTT, Circuit Judge, dissenting in part.

profit from operating it in 1931 only because of the depressed condition of the market. The judge below, in an able and exhaustive opinion, reviewed the evidence and affirmed the findings of the special master. Decree was entered for the $9,000 due as rental at the time of institution of suit with a finding that defendant was bound to perform all the obligations of the lessee under the leases "until they shall be terminated by the mining and removal of all minable coal remaining in the Sewell seam of coal in the demised premises, unless said defendant has been lawfully released or discharged from such obligations since the thirtieth day of September 1932, or shall hereafter be so released or discharged therefrom." From this decree the defendant has appealed.

The original leases, three in number, but practically identical in terms, were executed in the year 1895. At that time the Loop Creek branch of the Chesapeake & Ohio Railroad had just been completed into the coal field where the lands covered by the leases were situate. The coal mines in that section were few in number, only partially developed and too remote from the leased lands to give any reliable indication as to the coal to be expected thereon, which, moreover, could be reached only by shaft mining, a new form of mining in that section of West Virginia. There were rumors that the coal on Loop Creek was not as good as that which had been operated on New River, and there were other circumstances that rendered the operation of a shaft mine on the premises in question a venture of a highly speculative character. In such situation, the leases were executed for a period of twenty-one years, providing for a royalty of 8 cents per ton on coal mined with an annual fixed rent graduated up to $2,000, and providing also that, if at the end of the twenty-one year period all available coal should not have been taken from the premises, the term of the leases should be extended until it should have been mined, unless the lessors should elect to terminate the leases at that time and pay the lessee the value of the improvements which he had placed upon the property. The leases contained the following withdrawal clause as to the meaning of which there is much controversy, viz.: "In case the lessee finds he cannot work this lease at a profit he is to have the right to withdraw from this lease, and remove all improvements placed on the premises if the lessors who shall have the option to take said improvements or not, elect not to take or pay for said improvements, or any part of same."[1]

The lessee, one Laing, assigned his rights under the leases to the Sun Coal & Coke Company, and mining operations

---

[1] This provision should be considered in connection with other provisions relating to operation of the property, its connection therewith being shown by the following quotation from one of the leases:

"The lessee agrees to commence operating under this contract as soon as right of way for R R is secured and prosecute his mining operations in an energetic, approved and skilful manner; and employ a competent mining engineer; and have his mines surveyed and mapped at least twice each year and furnish copies of said maps to the lessors. And the lessors reserve the right to have the mines inspected by a competent expert or mining engineer as often as they may wish and have the mining done in the manner directed by such expert or engineer, subject however to this qualification, that if the lessee disapproves of the method or manner of mining so directed by said expert or engineer, and the parties cannot agree, then any dispute as to the method of operating the mines shall be settled by arbitration in the manner hereinafter provided, and the mining shall be done accordingly. * * * It is further agreed that an abandonment of said lease for a period of six months from any cause or the refusal or failure of the lessee to pay any installment of rent or royalty, as hereinbefore provided, for a period of five months after the same has become due and payable as aforesaid, or to observe and perform any of the requirements of this lease, then, in either of said events, at the option of the lessors the lessee shall forfeit all rights to said premises, and the improvements thereon shall be forfeited to the lessors as liquidated damages for such abandonment or failure, but shall not release the lessee from liability for rent or royalty that may be then due to the lessors. And it is further agreed that the lessors may reenter at any time for default in the payment of rent or royalty or for the breach of any of the covenants of this lease; It is hereby agreed that all the foregoing covenants and agreements to be kept and performed by the lessee, shall inure to the benefit of the lessors, their heirs and assigns, who may enforce the same in any legal manner. It is further agreed that, if during the existence of this lease, any question of difference or dispute shall

were commenced which resulted in the development of one of the most successful and profitable mines in the New River section of West Virginia. On February 26, 1906, lessors entered into a contract with the lessee, releasing their right to terminate the lease at the end of the twenty-one year period and extending and continuing in force "the terms of the said original leases for the mining of said leased premises until all coal on said premises in said Sewell seam, by which is meant the seam on said leased premises now being worked by the said Sun Coal & Coke Company, shall be taken therefrom". An agreement of July 9, 1908, increased the fixed rent to $12,000 per year but provided that "should the coal in said land become so nearly exhausted by proper mining as to render it impracticable, without fault on its part, to skillfully and properly mine sufficient coal to reimburse said company as provided in said leases and contract for the minimum or fixed rent hereby agreed on, then and in that event said minimum hereby agreed on shall be thereafter subject to an equitable reduction, so that said company shall not be required to thereafter pay a greater minimum or fixed rent than it can by energetic, skillful and

arise between the lessors and the lessee, their agents or engineers, relative to any provision or requirement of this lease of the method or manner of the performance of any duty or obligation required therein, such dispute or difference, at the instance of either party, shall be settled by two disinterested competent persons, and their umpire, one of said persons to be selected by the lessor and one by the lessee, and the said two to select the umpire and the decision of the majority of said arbitrators shall be final as to any such dispute or difference. It is further agreed that the lessee shall, at his own expense and cost, (except the expense of locating which is to be paid by the lessors) construct a branch railroad from the Loop Creek railroad to such point or points on the lands hereby leased as may be necessary to remove the coal mined under this lease. The said branch railroad is to be the property of the lessors, but the lessee is to have the use of the same without charge for the objects and purpose of this lease. It is further agreed that if the lessee is delayed in the prosecution of his operations under this lease by reason of any troubles or litigation in securing a right of way for said branch railroad, then the period of such delay shall be added to the term of this lease and likewise the payment of the fixed rents aforesaid shall be postponed for a time equal to such delay. It is further agreed that if at the termination of this lease all the available coal on said premises shall not have been taken therefrom, then, unless the lessors elect to pay the lessee (and the lessors shall have the right to do so at their option) the then value of all improvements, other than said branch railroad, which shall have been placed on said premises by the lessee, and which were necessary for the full operation and enjoyment of this lease, the term of this lease shall in that event be extended and continued in force in all respects and the lessee agrees to continue his mining operations under the provisions of this lease until all the remaining coal is mined and taken from the leased premises. And if the lessors elect to pay for said improvements at the termination of this lease as aforesaid, and the parties fail to agree upon the value of said improvements, then, such value is to be determined by arbitration in the manner hereinbefore provided. And it is further agreed, that, if all the coal is mined and taken from the leased premises by the lessee either during the original term of this lease or under the extension hereinbefore provided for, then the lessee shall be paid nothing for their improvements by the lessors, but the lessee shall have the right to remove, within a reasonable time, any or all the improvements they may have placed upon the leased premises other than said branch railroad. The lessors are to furnish the right of way and survey and map for railroad from the Loop Creek Railroad to leased premises. The mining under this lease is to be pushed as much as the average mine on Loop Creek, and if not so pushed this lease to be forfeited. In case of disagreement as to whether said mining is sufficiently pushed as aforesaid, the same is to be settled by arbitration as hereinabove provided for. In case the lessee finds he cannot work this lease at a profit he is to have the right to withdraw from this lease, and remove all improvements placed on the premises, if the lessors, who shall have the option to take said improvements or not, elect not to take or pay for said improvements, or any part of same. If lessors elect to take said improvements or any part of same, the value to be paid therefor shall be settled and determined by arbitrators chosen in the manner hereinbefore provided for. This lease is conditional upon the ability of the lessors to obtain the right of way for railroad from leased premises to the Loop Creek R. R. within five years from this date."

proper mining reimburse itself for as provided in said leases and contract."

In 1919, the Sun Coke & Coal Company assigned its rights under the leases to the New River Collieries Company, which continued to operate the mine until its rights were assigned to defendant in 1923. Thereafter defendant operated it until December 1, 1931. Two weeks prior to that date, i. e. on November 17, 1931, defendant served notice on the lessors that it could not work the leases at a profit and would exercise the right to withdraw therefrom under the provision heretofore quoted on December 1st. On that date it ceased mining operations and a few months thereafter withdrew its pumps and allowed the mine to fill up with water. Lessors denied the right of defendant to withdraw from the lease, and on November 23, 1931, notified it in writing that surrender of the lease would not be accepted and that they would expect defendant to continue mining operations and to perform and discharge all covenants and obligations of the leases.

At the time of the sale to defendant by the New River Collieries Company in 1923, plaintiffs were contending that the lessees had damaged the mine by improper mining methods; and defendant guaranteed the payment of any damages which might be recovered against the New River Collieries Company on that account. In April 1932, plaintiffs settled with the New River Collieries Company for this damage, accepting $30,000 to release defendant and the New River Collieries Company from this claim but expressly providing in the release that nothing therein contained should be construed to release defendant from its obligation to operate the mine and comply with the covenants and agreements contained in the leases under which it was being operated.

The principal contention of defendant is that, under the withdrawal provision heretofore quoted, it had the right to withdraw from the leases at any time upon finding that it could not continue operations thereunder at a profit; that it found that it could not profitably continue such operations and withdrew for that reason; and that consequently there was no further liability on its part. As we shall point out hereafter, we think that defendant's interpretation of the withdrawal clause as coterminous with the leases is erroneous; but, even if we assume for the sake of the argument that defendant's interpretation is correct, the facts of the case furnish no legal justification for the attempted withdrawal and cancellation of December 1st, for the reason that there was a large quantity of minable coal remaining in the mine at that time capable of being mined at a profit under normal conditions. This has been the subject of definite and elaborate findings both by the master and by the District Judge; and their findings are amply supported by the evidence, the greater part of which was addressed to this issue. The findings of the master with regard thereto are as follows:

"After hearing the evidence in this second issue and again reading it, all of which is commented upon in the briefs of able and diligent counsel, your special master finds that, while Stonega made an average profit from its mining over six years of its operation, it could not and did not profit in the year 1931 because of the depressed market only, and not because of drawbacks in the mine, or alleged increase in the costs of mining. Your special master is of the opinion and so finds that the mine, as operated by Stonega, made a profit on the average, under the prevailing normal market price of New River Coal prior to the depression. * * * The mine was far from being exhausted on December 1, 1931. Considering the evidence of Stonega's witnesses, who state the amount of coal then remaining in the mine to be about 1,712,999 tons, and plaintiffs' witnesses, Ferguson, Gates, Smith, Krebs and Wilson, who fix the amount (averaged) at more than three million tons, your special master is of the opinion that the tonnage remaining would be at least two million and three hundred thousand tons. This is necessarily an estimate based on the conflicting estimates of expert witnesses."

The District Judge in affirming the report of the master made the following findings with respect to this matter [26 F.Supp. 176]:

"Stonega, which appears to be a large organization with mines and interests elsewhere than in West Virginia, took an assignment of the lease and the property on the leased premises, along with another lease, or other leases, and other property in West Virginia in 1923, allocating for accounting purposes to the Sun property about $1,000,000 of the purchase money paid for the combined properties. Before

the purchase it caused to be made **a** comprehensive and thorough examination of the Sun mine extending over a period of several months by an adequate corps under the direction of its Vice President Taggart and its Chief Engineer Rogers. Its representatives knew when the purchase was made the disadvantages as well as the advantages of the property, including the handicaps which in this suit are complained of as tending to prevent profitable operation. Its representatives did not know the precise extent of an area of dirty coal found in the northwest portion of the property, but they had warning from indications in the Sun mine itself and from core drilling previously done on adjoining property, to the results of which they had access, that dirty coal might be expected there.

"Vice President Taggart made a written report, excerpts from which are in the record, advising that the mine be brought to a production of 30,000 tons per month, and estimating an expenditure of $200,000 to $250,000 as necessary to bring the mine and its equipment into satisfactory condition. He also reported that if smokeless coal should continue to bring on an average the price then prevailing of $3.60 per net ton of 2,000 pounds the investment in the Sun mine should be a profitable one.

"Stonega took over the Sun mine in September, 1923, proceeded to improve its condition and equipment and successfully operate it, though at no time did it have the benefit of an average price of $3.60 per net ton for the coal produced. In the few months of 1923 after the assignment and in the year 1924 Stonega's returns from its operations were less than its operating expenses, but in 1925 and succeeding years to and including the depression year of 1930 its cash receipts exceeded its cash operating expenses by an average of about $87,000 per year, and an aggregate of $521,499.87.

"1931 was the second year of the depression and all coal producers suffered, the total returns on all coal sold being considerably less than the total cost of production. In the eleven months of 1931 during which Stonega operated it sustained a heavy cash loss, due wholly, as the Special Master has found, to the great depression in the coal business. There was no excessive mining cost at the Sun mine in 1931, and its operating expenses per ton compared favorably with those of preceding years. And while the output was substantially less than in any other year of Stonega's operations except the year 1924, the production in the eleven months of 1931 was 308,590 net tons, yielding tonnage royalties of $22,285.11, as against the fixed or minimum rent for the year of $12,000.

\* \* \*

"The record contains much expert testimony as to conditions in the mine when Stonega discontinued operations, most of which in the view the Court takes of the case is irrelevant. But the Court is of opinion, as was the Special Master, that the weight of such evidence is with the plaintiffs and that the Sun mine was on December 1, 1931, as good as the average mine in the New River field, and capable of profitable operation when the average New River mine could be so operated.

"The minable coal in the Sun mine was far from exhausted. Stonega's witnesses admitted that more than 1,700,000 gross tons of minable coal remain therein, and the Court is of opinion that the Special Master was conservative in his finding that the tonnage remaining is at least 2,-300,000 tons. Much of the coal claimed before the Master as unminable was of the same character as Stonega had been successfully mining and selling for years, was mining at the time of its notice of withdrawal and was planning to continue mining, as shown on a mine map submitted to the plaintiffs about December 1, 1931, by symbols used by engineers to show intended operations and how they would be conducted."

And among the judge's conclusions of law appears the following pertinent statement as to the facts here under consideration:

"According to the weight of the evidence the Sun mine in November, 1931, was as good as the average mine in the New River field and susceptible of profitable operation when the average mine could be profitably operated, it contained at least 2,300,000 tons of minable coal, and had a productive capacity in excess of 30,000 tons per month, which was Mr. Taggart's aim in the report made of the examination of the mine before Stonega took it over.

"While impurities had been found in the coal in the northwest portion of the mine, it was minable with the exception of a relatively small area, much of it had been

mined, the product had been merchantable, and the remaining coal was of substantially the same character and quality as that which Stonega had mined and sold in previous years. A large part of the area claimed on the hearing by some of Stonega's witnesses as unminable consisted of the barriers of coal left for the protection of the 'roof' between 'rooms' which had previously been mined, and the product thereof shipped and sold. A considerable part of these barriers or 'pillars' had been mined and shipped, and the map submitted to the landlords on or about December 1, 1931, showed an intention to continue the work then under way in them.

"The working conditions in the mine and the condition of its equipment appear to have been substantially the same as in previous years after it had been rehabilitated by Stonega, as evidenced by the fact that the mining cost in 1931 was not excessive as compared with the previous years of Stonega's operations, or any of them. The only disappointment that Stonega suffered or cause for disappointment it encountered was the behavior of the market."

It is provided by Rule 52 (a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, that findings of fact shall not be set aside unless clearly erroneous, and that the findings of a master, to the extent that the court adopts them, shall be considered as findings of the court. This rule is grounded in wisdom and is but the formulation of practice long prevailing in courts of equity. Guilford Const. Co. v. Biggs, 4 Cir., 102 F.2d 46. It is a rule to be followed in all cases but particularly in one like this where there is a great volume of highly conflicting testimony, and where the master who had the advantage of seeing and hearing the witnesses is a highly trained lawyer of wide experience, both at the bar and upon the highest court of his state. After findings by such a master have been reviewed and affirmed by the judge below, who is himself a lawyer of wide knowledge and experience in this sort of litigation, it must be indeed a very clear case of error which would justify an appellate court in disturbing them. We find no such case here. On the contrary a careful examination of the record convinces us that the findings on this crucial matter were correct.

It must not be overlooked that the defendant stands in the shoes of those who have preceded it in the operation of the Sun mine; and questions as to the possibility of operating the mine at a profit are to be judged not alone in the light of defendant's experience but also in the light of the experience of its predecessors. This mine has been one of the largest producers of coal in the New River territory. It has been profitably operated over a long period of years. It still contains a large volume of valuable coal, estimated by the experts of defendant at 1,700,000 tons and by those of plaintiffs at 4,000,000 tons, and found by the master and the judge to be at least 2,300,000 tons. The production for the eleven months during which operations were conducted in 1931 was admittedly 308,590 tons, which was sold at approximately the current average market price, and upon which royalties of $22,285.11 were paid. The statement of defendant shows that, with the exception of the initial year and a quarter period of operation by defendant, its cash receipts from coal greatly exceeded its disbursements up until the year 1931, and that a loss was arrived at for the years 1925, 1928 and even the depression year 1930 only by taking account of the depreciation on capital investment. How much was properly allowable as depreciation on this investment was highly problematical. See Marsh Fork Coal Co. v. Lucas, Commissioner of Internal Revenue, 4 Cir., 42 F.2d 83. Certain it is that, from its capital investment, depreciated to $568,984.49, it salvaged property of the value of only $68,403.53; and it may well be that a large part of the $1,090,017.29 which defendant charged to capital account in setting up its books in 1923 would properly have been charged to cost of producing coal under the principles of the Marsh Fork Coal case if the differences between successive ownerships were ignored, and in that event no such depreciation charges as claimed by defendant would be allowable. At all events, there is nothing in the figures relied upon by defendant which would justify us in holding that the findings of the master approved by the District Judge are clearly erroneous, even if the depreciation charges be accepted as accurate and the profits reduced accordingly; for, even when this is done, profit is shown by defendant's operation except for the initial period and the depression years. When we consider, as we must, the experience of defendant's predecessors along with its experience, there seems no excuse whatever, from the standpoint of

the owners, for its deciding to abandon this valuable property, which had been operated for more than thirty years, upon a bare two weeks' notice.

These being the facts as to the condition of the mine and the possibility of the lessee's continuing to operate it at a profit, the interpretation of the withdrawal clause of the lease becomes a matter of minor importance; for even if that clause be construed as coterminous with the leases, it is clear that withdrawal by the defendant under the existing circumstances was not justified. In mineral leases of this character, it is well understood that the lessee takes the risk of fluctuations of the market (Cf. Williams-Pocahontas Coal Co. v. Berwind Land Co., 4 Cir., 76 F.2d 319); and it could not have been contemplated that the lessee should have the right to surrender the lease and throw the mine back upon the lessors because of the decline in prices due to an economic depression, which is generally of a temporary character. Only in the event of conditions arising which would prevent the mine being operated at a profit under normal circumstances would withdrawal under the clause be justified; and, as we have seen, no such conditions had arisen.

It is argued that the clause gave to the lessee the right of determining for itself whether the lease could be worked at a profit, and that the lessee's determination with respect to the matter, if made in good faith, is binding upon the lessors. The language of the provision is "In case the lessee finds he cannot work this lease at a profit, he is to have the right to withdraw from this lease". The word "finds" as so used, however, clearly imports discovery of a fact, not determination of a fact in controversy, as by a referee or arbitrator; and the pertinent inquiry is, not what the lessee has said as to the facts, but what the facts were. The question is: Could the lease be worked at a profit? As heretofore shown, any conclusion that it could not be so worked was not justified by the facts, when consideration is given to normal conditions and not merely to the temporary situation resulting from the depression.

We agree with the court below, however, in the conclusion that the withdrawal clause is not to be construed as coterminous with the term of the lease, but as providing a temporary right of withdrawal until the profitable nature of the new enterprise upon which the parties were embarking should have been determined. It will be noted that the lessee is not given the right to withdraw at any time he finds that mining operations under the lease cannot be continued at a profit, but "in case he finds that he cannot work this lease at a profit." The working of the lease is thus treated as one undertaking rather than as a process with varying incidents. The parties were embarking upon a venture of unknown possibilities; and the purpose of the clause was to permit the lessee to withdraw therefrom if after trial he should find that the venture was unprofitable. While the rule favoring the early vesting of estates is not, of course, applicable here, the reasoning at the basis thereof does apply; and the language of the condition should unquestionably be construed, if possible, so as to fix the rights of the parties with respect to the future mining of the property as soon as it was demonstrated that the lease was capable of being operated at a profit.

That this is no arbitrary construction will appear upon comparing the language of the withdrawal provision with the other provisions of the leases. The draftsman found no difficulty in making express provision that conditions were to be coterminous with the terms of the leases where this was intended. Thus in the arbitration provision, the language was, "if during the existence of this lease, any question of difference or dispute shall arise" etc. And in providing for removal of improvements upon the exhaustion of the coal, the language is "if all the coal is mined and taken from the leased premises by the lessee either during the original term of this lease or under the extension hereinbefore provided for". In the provision that mining should be pushed under the lease, the language is "The mining under this lease is to be pushed" etc. The provision last referred to immediately precedes the withdrawal clause and shows that where mining under the lease was meant, appropriate language was used to express the meaning. To follow such a provision with the language of the withdrawal clause, "In case the lessee finds he cannot work this lease at a profit", indicates that something other was intended thereby than that mining operations could not be continued profitably due to exhaustion of coal, which would have justified abandonment under other provisions. As said by the judge below, the language used

in the withdrawal clause indicates "a tentative or experimental occupation"; and, as we have indicated above, we think it has reference to the lease viewed as an integrated undertaking, granting to the lessee the right to withdraw therefrom upon finding after trial that the venture, viewed as a whole, was an unprofitable one.

When the mine was developed and proved to be one of the most profitable mines in the New River section, the withdrawal clause ceased to have any significance in the lease. And after the fixed period of twenty-one years had expired, the rights of the parties with respect to abandonment and liability for rents and royalties depended upon the provision that the lease was to be extended until all coal should be taken from the leased premises. This, of course, means no more than all coal that could be mined profitably under normal conditions. William C. Atwater & Co. v. Fall River Pocahontas Coal Co., 119 W.Va. 549, 195 S.E. 99, 102; Flavelle v. Red Jacket Consol. Coal & Coke Co., 82 W.Va. 295, 96 S.E. 600; Big Vein Pocahontas Coal Co. v. Browning, 137 Va. 34, 120 S.E. 247, 253; Hendon v. De Bardeleben Coal Corp., 5 Cir., 30 F.2d 686; Ridgely v. Conewago Iron Co., C.C., 53 F. 988. But as heretofore shown, the mine had not been exhausted of all coal that could be mined profitably under normal conditions; and there was consequently no right of abandonment.

One other contention of defendant requires brief notice. It is argued that the releases given by plaintiffs on April 15, 1932, to the New River Collieries Company released defendant from all further obligations with respect to the mine. We see nothing in this contention. The New River Company was liable to plaintiffs for damages resulting from the improper mining and the defendant had assumed this liability; but such liability was separate and distinct from the obligation to continue mining operations until available coal was exhausted. The negligent operations of New River had resulted in conditions which rendered it impossible to mine some of the coal at a profit which would otherwise have been profitably minable, and damages for such negligent operations were properly recoverable. But we fail to see how the recovery of damages on this account, or the execution of a release discharging New River and defendant from liability for such damages, could possibly be held to discharge defendant from its obligation to mine the available coal remaining in the mine and pay rents and royalties in accordance with the provisions of the leases. Particularly is this true in view of the fact that plaintiffs expressly reserved their right to enforce such obligation of defendant in executing the release.

Complaint is made of the decree in that it adjudicates that defendant is bound to perform, discharge and satisfy all the obligations of the lessee under the leases until they "shall be terminated by the mining and removal of all minable coal remaining in the Sewell seam of coal, in the demised premises, unless said defendant has been lawfully released or discharged from such obligations since the 30th day of September 1932, or shall hereafter be so released or discharged therefrom." As this was a suit in equity, we think it proper that the decree should speak as of the date of the decree, and not merely as of the date of institution of suit, and adjudicate the rights of the parties as of that time with provision for the enforcement of rights to accrue in the future under the instruments sued on, if proper basis therefor is laid in the pleadings. 10 R.C.L. 559; 21 C.J. 664; Randel v. Brown, 2 How. 406, 11 L.Ed. 318; Fleming v. Soutter, 6 Wall. 747, 18 L.Ed. 847; Dancel v. Goodyear Machinery Co., C.C., 137 F. 157; City of Denver v. Mercantile Trust Co., 8 Cir., 201 F. 790; Superior Oil & Gas Co. v. Mehlin, 25 Okl. 809, 108 P. 595, 138 Am.St.Rep. 942. We think, however, that the language of the decree is too broad in adjudicating that liability under the leases shall continue until they shall be terminated by the mining and removal of all minable coal, etc. The effect of this would be to impose liability for the minimum rental indefinitely in the future, although it is clear that liability should not be imposed for a longer period than that for which the 8 cent per ton royalty upon coal which could be mined profitably would pay such rental. Furthermore, there is nothing in the pleadings upon which to base such relief, unless it be the prayer for general relief. The decree appealed from will be modified, therefore, by eliminating therefrom the language contained in the last clause of paragraph four thereof. In other respects it will be affirmed; and the cause will be remanded to the end that the parties may file supplemental pleadings, *if*

they so desire, and the court below may properly determine what rentals, in addition to the $9,000.00 for which recovery has already been granted, plaintiffs are entitled to recover under the provisions of their leases.

Affirmed in part; reversed in part and remanded.

NORTHCOTT, Circuit Judge (concurring in part and dissenting in part).

I concur in the findings and conclusions in the majority opinion as to the facts as found by the special master and confirmed by the trial judge. I regret that I cannot concur as to the interpretation, as a matter of law, of the clause giving the lessee the right to withdraw from the lease "in case the lessee finds he cannot work this lease at a profit". There is no ambiguity in this clause, its words are plain and simple and its meaning is clear. It gave the lessee the right to surrender the lease whenever, in good faith, he found he could not work the lease at a profit. The decision was left to the judgment of the lessee. As stated in the majority opinion the proposed development was highly speculative and in order to have the coal mined the owners of the property were willing to give the lessee this option. Through all the changes in the lease and changes of ownership of the mine this clause was left unchanged, certainly with full notice to all parties.

Ambiguity should not be read into a plain clause in order to avoid the consequences of a contract made between competent parties. There are other clauses in the lease that show that this clause was intended to run throughout the life of the lease or any extension of it.

Nor do I think it proper to write into this clause the words "under normal conditions". Had the parties desired to so limit the clause they could have done so in the original lease. It is a known fact that normal conditions in the coal business in the section where this property is located have remained very bad since the giving of the notice of withdrawal in the instant case. From that date until now it seems clear that this operation could not have been carried on profitably and there is no prospect that the present normal conditions will change for the better in the near future, in the coal business. It is a known fact that coal mines operated under the most favorable conditions are the only ones that can be operated at a profit at the present time.

I cannot agree that the clause in the original lease should be given an interpretation not in accord with the plain meaning of common words so as to change the evident intent of the parties to the lease, when it was first executed.

I am of the opinion that the decree of the court below should be reversed as to the interpretation of the withdrawal clause in the lease.