Mary WOODRUFF, Individually and on behalf of her minor child Tina Louise Moore, et al., Plaintiffs,

v.

Abe LAVINE, Individually and as Commissioner of the New York State Department of Social Services, et al., Defendants.

No. 73 Civ. 5333.

United States District Court,
S. D. New York.

July 13, 1976.

---

Marttie L. Thompson, Community Action for Legal Services, New York City, for plaintiffs; Michael A. O'Connor, New York City, of counsel.

John C. Gray, Jr., South Brooklyn Legal Services, Brooklyn, N. Y., for plaintiffs; Janet Benshoof, Brooklyn, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for New York State defendants Toia and Whalen; Joseph W. Henneberry, Asst. Atty. Gen., New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for New York City defendant Smith; Gayle S. Redford, Robert S. Deutsch, New York City, of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This Court's opinion dated June 4, 1975 [1] denying plaintiffs' motion for partial summary judgment sets forth: the federal statute and regulations governing the preventive health care program known as Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") for Medicaid-eligible children under twenty-one years of age; the plaintiffs' various claims that defendants have failed to implement the program; and the defendants' contrary contentions that they were at that time in substantial compliance with federal requirements. Familiarity is assumed with that opinion, which sets forth material matters up to the date of decision.

In April 1976 a pretrial order was entered upon consent of the parties which limited the plaintiff class to Medicaid-eligible children in New York City who have not received EPSDT. A two-week trial in June 1976, during which administrators, policy makers and medical and public health experts testified and almost two hundred exhibits were received in evidence, brought up to date the factual situation with respect to the parties' contentions. The issues are to be decided as of the current state of events.[2]

The thrust of plaintiffs' various claims is that the defendants have failed, to a substantial degree, to implement certain essential components of the EPSDT program so that in fact it is not available to large numbers of Medicaid-eligible children in New York City. Based upon this Court's trial notes, which include its contemporaneous appraisal of each witness, a word-by-word reading of the trial transcript, a study of the exhibits and an evaluation of the witnesses' testimony and of their demeanor, the Court concludes that plaintiffs have failed to sustain their burden of proof as to their claims; to the contrary, the evidence abundantly establishes that the State and City are in substantial compliance with the federal statute and applicable regulations.

Essentially, no matter how stated, the burden of plaintiffs' complaint is that to date the EPSDT program has been under-utilized by eligible children. Thus, plaintiffs contend that since only ten to fourteen per cent of the eligible population have enrolled in the program, this establishes the defendants are in substantial violation of the federal statute and regulations. Plaintiffs' experts hypothesize that the program can be deemed successful only if eighty to eighty-five per cent of the eligibles are screened. While it may readily be admitted

---

1. 399 F.Supp. 1008 (S.D.N.Y.1975).

2. A court of equity acts to give relief appropriate to the current state of events. *Champion Spark Plug Co. v. Reich*, 121 F.2d 769, 772 (8th Cir.), *cert. denied*, 314 U.S. 669, 62 S.Ct. 130, 86 L.Ed. 535 (1941); *cf. Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Stonega Coke & Coal Co. v. Price*, 106 F.2d 411, 419 (4th Cir.), *cert. denied*, 308 U.S. 618, 6 S.Ct. 263, 84 L.Ed. 516 (1939).

that such a goal is highly desirable and hopefully eventually will be achieved, it cannot by itself serve to gauge defendants' performance. The Department of Health, Education, and Welfare ("HEW") has no quota for screening, and compliance with the statute and regulations does not require that a fixed percentage of eligible children be screened; compliance is measured by availability of services to eligibles who request them.

The Court finds the testimony of plaintiffs' several experts, however sincere in their views, far from persuasive. They have, in different instances in their generalized judgments, failed to take into account significant facts relating to the EPSDT program in New York City or have had little or no knowledge of its operations or of the City's problems with respect to preventive health care programs. Plaintiffs' various conceptual theories of how better to implement the program and to effect its greater utilization must yield to reality both in terms of administrative problems encountered by officials and lack of cooperation on the part of those entitled to participate in the program. The fact is that the program is voluntary; intended beneficiaries cannot be compelled to participate. A carrot may be offered but a stick may not be used. Despite the best efforts of administrators to popularize such a program, it will still meet with resistance or indifference by members of the socio-economic group for whose benefit it is intended. This generally has been true in all such programs, even those intended for a higher income level group.[3]

The defendants do not claim that the City's program was administered with per-fection in its initial stages. There were the usual problems incidental to a new governmental program of magnitude. But, as experience revealed shortcomings, the defendants brought into play more efficient and effective means of reaching all Medicaid-eligible children, as the following analysis will indicate.

## THE STATE AND THE CITY ROLE IN EPSDT

The federal regulatory scheme detailed in this Court's previous opinion requires that the State establish an "outreach" program for informing all eligible individuals of the available services and "encouraging" them to participate.[4] The State must then arrange screening and any corrective treatment[5] for each eligible individual requesting an examination by seeking out and developing agreements with health providers who offer such services.[6]

Under the New York State Child Health Assurance Program ("CHAP"), as implemented in New York City through the City CHAP Plan, the organizational structure for fulfilling these EPSDT obligations is as follows: The CHAP Central Office of the City Department of Social Services is responsible for computerized identification of the eligible population and for making initial contacts with eligible individuals although the Office of Case Intake and Management of the Department ("OCIM") handles all face-to-face contacts under the program.[7] Any requests for services resulting from such outreach activity are referred by the CHAP Central Office to independent public and private health providers who have been brought into the program by that

---

3. The New York City Commissioner of Health testified that, in the experience of all public health officials throughout the country, the lower socio-economic groups respond poorly to preventive health services programs despite efforts to educate them on the importance of preventive care. Thus, the Commissioner cited the "remarkably low utilization rate" of the Health Insurance Plan by the Medicaid population.

4. Program Regulation Guide, MSA–PRG–21, at 5 (June 28, 1972).

5. 42 U.S.C. § 603(g)(2), (3).

6. Program Regulation Guide, MSA–PRG–21, at 5.

7. OCIM is the social service branch of the New York City Department of Social Services. It is a field work organization which provides access to people eligible for the various specialized services administered by the City Human Resources Administration. It has 36 offices throughout the City.

828

Office to perform the actual screening, diagnosis and treatment under contract with the City. Each CHAP provider assumes responsibility for providing all the components of the CHAP examination according to the State-prescribed periodicity schedule and for generally encouraging eligibles to participate fully in the program.[8]

The CHAP Central Office is also responsible for following-up on all screenings to assure that any child requesting service is examined, but again, any follow-up by personal contact on children who fail to keep appointments is assigned to OCIM. Finally, referral for and follow-up on diagnosis and treatment is the responsibility of the provider who has screened the child and determined him to be in need of such care.

Thus, while the ultimate accountability for implementing EPSDT under the federal scheme rests with the State, the State has delegated the day-to-day operations of CHAP to the City and, in particular, to the CHAP Central Office of the City Department of Social Services. However, the State Department of Social Services is responsible for overseeing the City CHAP operation and the State Department of Health is required to set and enforce standards of health care given by the providers. On the City level, the City Department of Health is also a monitor of providers both as to the quality of care and the effectiveness of provider follow-up from screening through diagnosis and treatment.

At present there is no central authority in either the State or City to follow a specific child through every stage of the CHAP system.[9] However, as noted, the system does provide for various checks, at each level, to assure that any child who requests CHAP receives both a screening and necessary diagnosis and treatment within the permissible time frames.

While a central tracking unit would facilitate evaluation of the effectiveness of CHAP, this Court's sole concern is with whether each branch of the present CHAP system has been shown to be performing the function assigned it so that the sum of the parts is an EPSDT program in substantial compliance with the federal regulatory scheme.

We consider separately each of plaintiffs' claims of defendants' shortcomings with respect to CHAP.

I. *Identification of the eligible population.*

Plaintiffs at the outset contend that the defendants have not satisfied the federal requirement that the State provide for identification of all eligible individuals under EPSDT.[10] The City set up a computerized identification system that has been expanded over the course of CHAP implementation to contain a master file listing all families eligible for EPSDT in New York City which is now updated every four to six weeks. The file is organized on a family specific basis to coordinate with the preexisting City-wide computer system, but the ages of all children within each family are noted and updated periodically.

While the figures change monthly, the State and City estimate that the number of children eligible for EPSDT in New York City is approximately 750,000. One of plaintiffs' experts disputes this estimate because it fails to include the "turnover" of families entering and leaving the New York

---

8. The components of a CHAP examination are as follows: (1) history; (2) developmental appraisal; (3) sensory tests for vision and hearing; (4) physical examination, including eyes, ears, nose, mouth and throat, head and neck, cardio-pulmonary, abdomen, genito-urinary, musculo-skeletal (includes posture), neurological, skin condition and behavior; (5) dental screening; (6) immunizations for DPT, polio, measles, rubella and mumps; (7) lab tests, including anemia, urinalysis, sickle cell, lead poisoning, tuberculin and VDRL/GC; and (8) discussion and counselling.

9. The CHAP Central Office is now developing a computer program which will take a 10% sample of all children requesting CHAP services and follow each child selected through the entire CHAP process. This is intended solely as a check on the effectiveness of the program, but there is potential for a 100% child specific tracking system.

10. 45 C.F.R. § 249.10(a)(3)(ii).

City assistance rolls. But the City is aware of this turnover and, in an effort to reach all eligibles with dispatch, it has recently programmed the computer to send a packet of information on CHAP services to all families newly eligible for CHAP each month.

Plaintiffs also charge that defendants "purge" from the "target" population all children deemed to be under appropriate medical supervision and, thus, not in need of CHAP services. There is, of course, no need to duplicate preventive health services for a child who is already receiving adequate medical examination, diagnosis and treatment. Plaintiffs' specific charge is that the City accepts the word of the parent without verifying that in fact the child is receiving medical care equivalent to that provided by CHAP. The City readily admits that when a parent who has been solicited refuses CHAP services for a child because the child is already receiving medical care from a private physician or other deliverer of medical services, the City does not attempt to verify the parent's representation. While verification is optional under the State CHAP Plan, the evidence establishes that the City did attempt to get confirmation from a child's health provider but discontinued these efforts because most health providers failed to respond and compliance could not be enforced.

There is no federal requirement that verification be made. The obligation of the State and the City is to provide screening services in all cases when requested. The City does not remove any child from its computerized master file of eligibles on the basis of the parent's representation that he is receiving medical care. Rather, only certain computer-generated notices to that child are held up until the child is due, under the State-prescribed periodicity schedule, for another screening. But, as we will see, computer notification is only one aspect of the City's extensive outreach program.

Plaintiffs allege, further, that even if the City were verifying alternative care, the State standard for determining appropriate medical supervision is not on a par with the CHAP screening components. The State considers a child to be receiving appropriate medical care and thus not in need of CHAP services if the child is being seen by a physician at prescribed intervals without reference to the specifics of actual treatment. The State is not attempting to determine equivalent care on a check-list basis; it is concerned with maintaining an existing viable physician-child relationship which it deems more important than merely assuring that each separate component of a CHAP screening is being administered to the child.

Again, there is no federal requirement that children be determined to be receiving "equivalent" care, as the plaintiffs argue, and there is no power vested in the City or State to force a parent to break ties with the physician treating the child. Further, as the Assistant Commissioner for OCIM, with twenty-six years of social work experience, testified, a parent has a natural interest in the child and a familiarity with its needs and its relationship to the treating physician that provide a perspective for making the decision to remain with that physician, which cannot be matched by a social service worker in a brief face-to-face interview. While it has been suggested that a parent is not in a position to know the precise nature and quality of the medical services the physician is rendering to the child, it is rather farfetched to urge that a duly licensed physician engaged by a parent to take care of a child's needs is not conforming to medical requirements or that he is incompetent.

The State's policy decision in recognizing existing child-physician relationships is in no way contrary to federal law and there is no reason to hold the City to a verification effort which has proved futile when the City continues to reach out to children deemed under appropriate medical supervision, as well as other eligible children.

II. *Outreach.*

Plaintiffs next allege that defendants have failed to set up an aggressive "out-

reach program," a term which, as this Court noted in its prior opinion, is the official jargon for a program to publicize EPSDT in an effort to search out eligible children and to bring home to their parents its benefits and advantages, and thereby achieve maximum participation.[11] In 1972, Congress imposed a penalty of one per cent reduction of federal payments due to a State if it failed "to inform" all families receiving aid to families with dependent children of the availability of child health screening services.[12] In the regulations promulgated to effectuate this statute, "to inform" is defined as

> to notify all AFDC families in writing no less often than annually of the availability of the early and periodic screening, diagnosis and treatment (EPSDT) program . . . by providing pamphlets, brochures, or other written materials, which clearly and specifically describe (A) what EPSDT services are available and (B) where and how they may be obtained.[13]

The City has gone far beyond the annual written notice requirement of the federal penalty statute in its efforts to fulfill the broader "outreach" purposes of the federal law which, according to HEW's Medical Assistance Manual, include not only informing parents of CHAP, but "encouraging" them to take advantage of the services by making sure "that they understand the nature and purpose of the screening program" and by enlisting "the help of other community agencies in casefinding activities." [14]

The defendants have applied computerization, mailings, face-to-face interviews, posters and other public information techniques to reach the eligible population to inform them and their families of the availability and the nature of CHAP, and to encourage their participation in the program. The HEW Regional Office has considered the City in compliance with the notification requirement since the third quarter of fiscal 1974 when, in March 1975, the City instituted an annual mailing of CHAP "check-stuffers" to all public assistance recipients by sending 300,000 check-stuffers to reach an estimated 650,000 to 700,000 children. This year those families eligible only for Medicaid will also be reached by mass mailing. The check-stuffer notices inform the family of CHAP services with a description in English and Spanish and list a phone number to call for further information.[15] In January and February of this year OCIM sent out its own check-stuffer to 300,000 public assistance families and 450,000 Medicaid families in New York City. This notice, which covers all social services offered by OCIM, contains a reference to CHAP services and also lists a phone number to call for further information.

---

11. Program Regulation Guide, MSA–PRG–21 (June 28, 1972).

12. 42 U.S.C. § 603(g)(1).

13. 45 C.F.R. § 205.146(c)(1)(i).

14. Program Regulation Guide, MSA–PRG–21 at 5.

15. These are inserted in envelopes which contain the checks to the recipients and read as follows:

Dear Parent:

The New York City Department of Social Services has begun a method of providing regular health care for children under 21 who are eligible for Medicaid. It consists of a complete physical examination to detect the presence of such illnesses as T.B., lead poisoning, high blood pressure, sickle cell anemia and diabetes, and to provide the necessary corrective action. It can locate possible problems in hearing, sight, growth and many other things affecting the child's health which might otherwise go unnoticed.

Your child will also receive protection against diseases such as polio, measles and other well-known childhood illnesses.

YOUR CHILD'S HEALTH IS THE MOST IMPORTANT THING HE HAS. PROTECT IT!

While you may feel your children are already receiving adequate medical care, if you wish more information about this special health care program, including the names of participating clinics, please contact the New York City Department of Social Services at 553–5458 and ask about the program CHAP (Child Health Assurance Program). You do not have to call if you have already received a list of clinics from the Department of Social Services which involves the EPSDT program.

Initially, the City also instituted a "computer notification" system which was then conceived as the basic outreach component of CHAP. Under this program, a packet containing a letter fully describing CHAP services in English and Spanish, a list of available providers and a reply form with a self-addressed stamped envelope is sent out to an average of 12,000–13,000 families monthly. These families are selected at random from the entire eligible population with factors of ages of the children and provider location taken into account. If a family does not respond to the mailing the computer is programmed to mail out a reminder letter within sixty days and, if the reminder letter is unanswered, the computer generates a label on the family which is sent to OCIM for personal follow-up by a case worker who either phones or visits the family.

While the computer notification method of outreach will continue to be used by the CHAP Central Office,[16] its use is now secondary to a new system of face-to-face contact instituted through OCIM in January of this year. All public assistance recipients in New York City must appear for face-to-face recertification interviews twice a year to establish their continued eligibility and all Medicaid recipients attend such interviews once yearly. In January 1976 these required appearances were availed of to supplement existing methods to reach eligible families when a plan was put into effect to place OCIM case worker teams in recertification centers to discuss CHAP with eligibles in face-to-face interviews. By the end of July 1976, teams will be in all eight centers with forty-five case workers and supervisors allocated to the project. The OCIM team workers are carefully briefed, both in person and by lengthy written materials, on how to most effectively conduct the interviews.

Over and above the City's efforts to contact each eligible family directly, both in person and by mail, pamphlets and leaflets on CHAP have been distributed throughout the City. Thus, the City has distributed another 300,000 brochures supplied by the State which thoroughly described CHAP in both English and Spanish. Additionally, OCIM has distributed 200,000 of its own leaflets, which make reference to CHAP, through income maintenance centers, senior citizen centers, Social Security administration centers and community groups.

In light of this massive effort by the City, on all fronts, to reach the population of children eligible for CHAP, it is difficult to understand plaintiffs' objections. The opinion of plaintiffs' expert, a demographer, that the City's outreach efforts are inadequate, is entirely unpersuasive and entitled to little weight since admittedly she failed to take into account all the means adopted by the City, particularly the recertification face-to-face interviews to reach eligible children, the effectiveness of which is not open to challenge.

Plaintiffs' tenuous complaint rests upon a fragmentation of the City's extensive outreach program and a failure to consider the impact of the total program which is well gauged to reach every eligible individual. While, as plaintiffs assert, neither the computer notification system nor the recertification interviews have yet to cover every eligible family, this is simply a matter of a short time since recertification is mandatory for all recipients.

In sum, plaintiffs have failed to show that defendants' outreach efforts are in any way substandard under the federal regulatory scheme. In fact, it is difficult to conceive of a more thorough ongoing approach to the problem of informing and encouraging participation in CHAP than the City has now devised, after much seeking for refinement and improvement.

III. *Providers.*

Plaintiffs next complain that the City has failed to recruit a sufficient number of providers to screen all Medicaid-eligible chil-

---

16. Those families who are listed as newly eligible for CHAP each month will still be notified by computer so that they do not have to wait for the annual mass mailing to be alerted in writing of the services available to them.

832

dren. Based upon the opinion of their expert demographer, they argue that the measure for testing the adequacy of provider capacity must be the entire eligible population.

Under the federal statute, the State must either provide or arrange for the provision of screening services in all cases "where they are requested." [17] This entails, under HEW regulations, seeking out and developing agreements with facilities and practitioners that are able to provide EPSDT services [18] and "agreements to assure maximum utilization of existing screening, diagnostic, and treatment services provided by other public and voluntary agencies." [19] The State must also set standards to assure that the medical and remedial care and services given by the facilities are of high quality.[20]

Existing health service providers are actively recruited in the CHAP program. At the beginning, the only health care providers participating in EPSDT in the City were the City Department of Health's Child Health Stations which have the capacity to screen 108,000 children for CHAP a year but only children under six years of age. The Stations now do· approximately fifty per cent of CHAP screenings, with the balance done by private providers. These providers are "Article 28" institutions—hospitals and free-standing clinics with back-up hospitals authorized by the State to deliver health services—which have been brought into CHAP through the ongoing recruitment efforts of the CHAP Central Office.[21] The Health Department also provides CHAP services to children in the 239 day care centers throughout the City which have elected to use a Department of Health physician. The City Director of CHAP, as

well as other City and State administrators, testified that there are at present and in the foreseeable future sufficient providers to handle all requests for CHAP services from children under six and those over six years of age. Nothing of substance has been presented to challenge the judgment of these experienced administrators.

■ To require, as plaintiffs urge, a sufficient number of providers to screen all Medicaid-eligible children, even though all do not avail themselves of the service or are receiving medical health care through other services, would not only be unrealistic but economically wasteful and poor administration. So long as there are adequate providers to meet the need, defendants are in compliance. The evidence establishes that not only has the City recruited sufficient providers but that in no single instance where an eligible child requested screening was this denied to him.

■ The plaintiffs next contend that the defendants have failed to live up to their responsibility to assure that the medical and remedial care and services rendered by CHAP providers "are of high quality." [22] Providers are certified as qualified only after their evaluation by the Office of Professional Standards of the New York City Department of Health and following a site inspection by the Department's officials to determine the adequacy of equipment and facilities and the competency of the staff to carry on CHAP in accordance with its standards of health care. To assure that the performance of the certified providers measures up to the standard of high quality, periodic on-site inspections are conducted by a Health Department team of specialists composed of a physician, auditor, audiologist, public health nurse and lab techni-

17. 42 U.S.C. § 603(g)(2).

18. Program Regulation Guide, MSA–PRG–21, at 5.

19. 45 C.F.R. § 249.10(a)(3)(iii).

20. 45 C.F.R. § 249.10(a)(8).

21. Article 28 of the New York State Public Health Law provides that all facilities or institutions, as defined in section 2801, which are engaged in providing medical services in New York City must be certified by the City's health services administration upon a determination, under section 2805, that "the personnel, premises, equipment, rules and by-laws and standards of medical care and hospital service are fit and adequate."

22. 45 C.F.R. § 249.10(a)(8).

cian. The team assesses the quality of care provided, evaluates procedures used in the delivery of health care services, observes staff performance, checks plant facilities and equipment and reviews patients' charts.[23] Article 28 providers are inspected once a year and Child Health Stations twice a year. In instances where deficiencies appear, the provider is required to correct conditions or improve services, failing which it is eliminated from the program, as has occurred in a number of cases.

Plaintiffs complain that while at least 600 site visits were originally planned by the Department, only twenty audit reports have been actually made. However, the City's original estimates on the number of providers, based on expected number of requests for services, have not materialized. Over eighty per cent of current providers have been site checked.

There is a further check as to whether the providers are rendering services in accordance with CHAP standards. Both the CHAP Central Office and the City Department of Health audit the "Periodic Child Health Examination Report and Claim Forms" ("Report and Claim Forms") submitted by providers for payment of screenings. The Report and Claim Forms list all the components of the CHAP screening examination and the provider is required to fill out the results for each item on each child screened. If upon audit examination the form is incomplete or improperly filled out, the CHAP Central Office refuses to make payment.

While, to be sure, both the on-site visits and the Report and Claim Form reviews have demonstrated instances of deficiencies in services being rendered, these have been corrected when called to the attention of the provider, or, as already noted, providers who fail to meet standards have been eliminated from the program. The City was and continues to be vigilant to assure that the delivery of health services to the children measures up to CHAP standards of health care.

■ There is one problem plaguing all providers which has been difficult of resolution. Since there are not enough dental providers in the City willing to handle Medicaid-eligible children, referrals for dental services cannot always be made within the sixty-day period set by the federal regulations.[24] However, this sixty-day period is not mandatory; rather the regulation provides that screening must occur "within a *reasonable* period *normally* not to exceed 60 days." [25] The CHAP Central Office does not approve forms without dental referrals being indicated, but it does allow for a "reasonable" though longer than "normal" period for such referrals to be made. Under the circumstances, this is substantial compliance with the regulation.

Upon the totality of the evidence, this Court is convinced that the City has set up and is operating an effective mechanism for recruiting and thereafter carefully monitoring providers of CHAP services which entirely satisfies the federal guidelines. The determined purpose of the City to assure the quality of the services provided is manifested by the fact that the evaluation by on-site inspection procedure was initiated entirely by the City and is not done anywhere else in the State or in the entire country.

IV. *Follow-up.*

The federal regulations require that the State not only inform recipients requesting screening or in need of diagnosis and treatment of the names and locations of health providers, but also assist recipients needing such services so that they are able to receive them "within a reasonable period normally not to exceed 60 days from the date of request" or sixty days from the date of screening for diagnosis and treatment.[26]

Plaintiffs charge that defendants have failed to adequately follow up on requests

---

23. See Part IV(b), *infra.*

24. 45 C.F.R. § 205.146(c)(1)(ii)(B).

25. *Id.* (emphasis added).

26. 45 C.F.R. § 205.146(c)(1)(ii)(A), (B), (c)(1)(iii)(A), (B).

for screenings to assure that the screenings actually occur and further, that requisite diagnosis and treatment take place within sixty days.

### (a) Follow-up on screenings

The City's procedure for assuring that a child who requests a screening is actually examined has been under review in an effort to improve this aspect of the program. Originally, reliance was placed entirely on the CHAP computer system to follow up on screenings.[27] This method was found wanting for two reasons: first, since the computer is family specific, it could not follow up on individual children; second, there was a 120-day time lag which was considered an excessive delay in follow-up. As a result, the CHAP Central Office is now implementing a manual system which is based on a "Clinical Referral and Tracking Form." When a family request is received, the CHAP Central Office fills out this form for each individual child and sends it to the chosen provider. If the child fails to keep his appointment the provider returns the form to the CHAP Central Office which forwards a copy to OCIM for personal follow-up.

Since the new system is entirely independent of the computer system, plaintiffs' computer expert's testimony that the computer system is inadequate to perform the follow-up function is irrelevant. This expert also was of the opinion that it would be impossible to do all the paperwork involved in follow-up manually if the entire eligible population elected to request CHAP services. However, as already indicated, the community for whom the program was intended has not rushed to avail itself of its benefits. Again, theory must yield to reality. The record abundantly establishes that the CHAP Central Office handles the volume of requests it now receives without any backlog and that it is equipped to process requests it will receive in the foreseeable future. In short, there is simply no evidence to support plaintiffs' charge that the lack of adequate staffing at the CHAP Central Office creates a "bottleneck" which is slowing down implementation of CHAP.

Plaintiffs also allege a similar "bottleneck" exists at OCIM for personal follow-up requests made by the CHAP Central Office. Here plaintiffs rely on internal OCIM staff memoranda and worksheets which appear to indicate a backlog of reports on CHAP contacts by OCIM workers outstanding throughout 1975. The evidence indicates that these documents do not accurately reflect actual OCIM workers' contacts since not all contacts were reported at that time.

While there may have been some problem at OCIM in clearing all personal contact requests made by the CHAP Central Office in 1975, the evidence establishes that OCIM, with 855 workers allocated to CHAP functions, is presently adequately staffed. This Court finds that the City is in substantial compliance with the federal requirements on all aspects of its follow-up on screenings.[28]

### (b) Follow-up on diagnosis and treatment

Plaintiffs' next attack is levelled upon defendants' alleged inadequacies in following-up individual children in those instances

---

**27.** The original procedure for follow-up on screenings was as follows: When a request was received at the CHAP Central Office from any source, the family case was put into the computer and a referral list with the name of each child was sent to the requested provider to set up an appointment for a screening. After the examination, the provider sent a billing form to the Central Office. If the computer did not receive the form within 60 days it sent out a "broken appointment" letter to the family. If no answer was received within 60 days the computer generated a label on the family which was sent to OCIM for follow-up either by phone or in person.

**28.** As of the third quarter of fiscal 1974, the HEW Regional Office proposed findings that the City was out of compliance with the federal penalty statute, 42 U.S.C. § 603(g), for failure to assure provision and documentation of screening. This proposed determination is sharply disputed by the State and City and has not yet been adopted by the Department as final. Further, it was based on problems with the computer system, specifically the inability to track an individual child, which are resolved by the newly instituted manual system.

where screening indicates the need for diagnosis and treatment to assure that such care is provided.

Under the City CHAP Plan, responsibility for follow-up on diagnosis and treatment is delegated to providers who have the expertise and training to assure that the children they screen receive proper treatment for any detected health problems. The City Department of Health is the agency that monitors the providers' follow-up on diagnosis and treatment. It uses a sampling method of evaluation.[29] The Health Department staff takes a five per cent sample at random of all Report and Claim Forms submitted by providers to the CHAP Central Office for payment on screenings. The staff then selects from this group all forms which note referrals for diagnosis and treatment. Of the forms containing such referrals, the staff takes a twenty-five per cent subsample at random. These are the children's cases which are then investigated by the staff for proper follow-up.

The staff examines the medical records or charts corresponding to the forms at the provider's facility to check that the information submitted is accurate. The staff also checks for documentation that the child actually received the prescribed diagnosis and treatment.

Upon finding deficiencies in provider follow-up, the Department requires the provider to cure the defects. If the provider fails to do so its facility is closed to CHAP services. However, the evidence establishes that most providers have responded with significant improvements. The evidence further shows that the Health Department and the providers are generally working in a cooperative effort to implement a follow-up system which is new to the providers and foreign to their normal mode of operation, and that those who do not cooperate are dropped from CHAP.

Plaintiffs further contend that the Department has reviewed an insufficient number of records contrary to its prescribed criteria for sampling. The contention is without substance and again disregards the facts. The evidence establishes that the Department has adhered to its prescribed procedure.

Under all the circumstances, this Court finds that the City's mechanism for assuring follow-up on diagnosis and treatment is in substantial compliance with the federal law.[30]

## V. Transportation.

Plaintiffs' broadside attack upon defendants' efforts to implement CHAP has been directed to each and every phase of that program. Their next claim is the alleged failure to ensure that transportation expenses are provided, which plaintiffs contend creates a significant barrier to participation in CHAP.

The federal scheme requires the State to inform recipients requesting screening or needing diagnosis and treatment of the availability of transportation services[31] and "to assure that families are helped, if they need such assistance, to obtain transportation to the screening center and for diagnostic studies and treatment."[32]

Under the City CHAP system transportation expenses are available to recipients through OCIM, although some providers also give transportation funds. The recipi-

**29.** In May 1975, HEW approved the City's arrangement with providers on follow-up for diagnosis and treatment upon condition that a procedure be established using a "statistically valid sample" to monitor providers' performance.

**30.** While the HEW Regional Office proposed a finding that the City was out of compliance with the federal penalty statute, 42 U.S.C. § 603(g), for failure to adequately document follow-up during the second and third quarters of fiscal 1974, this proposed determination has been strongly contested by the State and City, and HEW has not as yet acted. More important, the Regional Office's determination was made before the City had fully implemented the Department of Health sample monitoring system and thus is irrelevant as to the current situation.

**31.** 45 C.F.R. § 205.146(c)(1)(ii)(A), (iii)(A).

**32.** Program Regulation Guide, MSA–PRG–21, at 5.

ent is made aware of the available transportation services by the computer notification packets, at the OCIM recertification interviews and through any other contacts he may have with OCIM workers. Furthermore, OCIM has distributed posters at various agencies throughout the City, printed in English and Spanish, describing the availability of transportation expenses for CHAP. Leaflets alerting recipients to CHAP transportation benefits both for screenings and for diagnosis and treatment have been similarly distributed and OCIM plans a mailing in September of this year to all public assistance and Medicaid recipients which will include a special leaflet on transportation services for CHAP.

Despite substantial testimony that under this system eligibles receive transportation funds when needed, including taxi fare where required, plaintiffs stubbornly insist that defendants have failed to offer such funds "in effective terms." The plaintiffs' argument with respect to their transportation claim borders on the captious, particularly when it is recognized that a substantial percentage of the eligibles are within walking distance of providers and what is involved in the instance of the others is a token for a subway or bus ride. There is no proof that in any instance any eligible person who requested transportation was denied benefits. This Court finds the City's efforts to inform recipients of their transportation benefits under CHAP and to help them receive such benefits to be more than adequate under the federal guidelines.

### VI. *State supervision of the City CHAP program.*

As plaintiffs assert, the State is "ultimately" responsible for implementing an EPSDT program in compliance with the federal Medicaid statute and regulations. However, New York State is one of the few states in which the Medicaid program, while State supervised, is locally administered.

Plaintiffs contend that the State has failed to supervise effectively this local administration of CHAP. State Bulletin 190

is a comprehensive guide to the local districts for implementing CHAP and the standards for medical care not included in the Bulletin are fully delineated in the State Medical Handbook, which has an entire section devoted to CHAP.[33] Further, the Bulletin has been supplemented by a series of administrative letters from the State Department of Social Services to the local districts, including New York, covering various aspects of CHAP implementation.

The City is required to submit formal reports on screenings monthly to the State Department of Social Services. There is no formal reporting requirement on the other aspects of CHAP, but the Director of Medical Administration at the State Department of Social Services and her staff have established a working relationship with the City CHAP staff. One staff member is assigned to work exclusively on New York City's program; visits are made several times a month to the CHAP Central Office and there is daily phone contact.

The Director and her staff are well versed in the City CHAP operation and discuss with the City staff most of the problems which arise and propose changes to secure greater efficiency. There is no evidence that the formal monitoring and auditing system advocated by plaintiffs would be more effective for supervising the administration of CHAP in the City. The Court finds that the State supervision of the program is entirely adequate.

### VII. *Plaintiffs' constitutional claim.*

Plaintiffs' final claim is that the City is discriminating against eligible children over six years of age in violation of their federal constitutional rights under the Fourteenth Amendment by failing to make CHAP services available to them equally with children under six years of age.

In consideration of the size and scope of the endeavor required to develop fully an EPSDT program, HEW permitted implementation to occur in stages. Thus, the

**33.** State Medical Handbook Item 44.

State, initially, was to make its EPSDT program available to all eligible children under six years of age and then, within a year and a half, was to make it available to all eligible children over six.[34] Accordingly, at the outset of CHAP, defendants stressed efforts to reach out to eligible children under six through the computer notification system and to service this population through the Child Health Stations. However, this Court has found, upon the totality of the evidence, that the City is now reaching out to the entire eligible population, especially through the OCIM face-to-face interviews at recertification centers. Since this Court has also determined that there are sufficient Article 28 providers to service all requests generated by such wide-ranging outreach activity in the present and foreseeable future, plaintiffs' charge of discrimination against children over six years of age must fail.

In sum, plaintiffs' hypercritical attack upon the City's efforts dissolves upon a careful review of the record and a study of CHAP's day-by-day functioning. No doubt, in a program so vast, there are bound to be kinks, particularly in a pioneering program of this type. As has been aptly said in another context, "the machinery of government would not work if it were not allowed a little play in its joints."[35] Performance is not to be tested by the ideal of perfection, but rather by the standard of substantial compliance with the statute and regulations. The test of compliance is not the proportion of the eligible population that participates in the program, but whether the State and City have taken and are taking "aggressive steps to screen, diagnose and treat children with health problems."[36] The record here establishes that the City and State have met that test—that they have been vigilant and constant in their efforts to implement CHAP so that its benefits will be availed of by all eligible children.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

**34.** 45 C.F.R. § 249.10(a)(3)(iv).

**35.** *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931).

**36.** Program Regulation Guide, MSA–PRG–21, at 1; *see also Stanton v. Bond*, 504 F.2d 1246, 1250 (7th Cir. 1974).